# CASES

## ARGUED AND DETERMINED

IN THE

# SUPREME COURT OF VERMONT.

JAMES M. BOUTWELL, et al., *vs.* WILLIAM MARR, et al.

October Term, 1896.

Present: ROSS, C. J., TAFT, ROWELL, TYLER and MUNSON, JJ.

Opinion filed February 15, 1899.

*Conspiracy.*—The crime of conspiracy consists in a combination of two or more persons to effect an illegal purpose, either by legal or illegal means, or to effect a legal purpose by illegal means.

*Conspiracy.*—The law punishes as a crime the mere agreement to effect an illegal purpose or to use illegal means; but a civil action cannot be sustained unless something causing damage to the plaintiff has been done in furtherance of the agreement.

*Intimidation.*—One has a right to withdraw his own patronage when he pleases, but he has no right to employ threats or intimidation to divert the patronage of another.

*Boycotting.*—If it be granted as a general proposition that several may lawfully unite in doing to another's injury, even for the accomplishment of an unlawful purpose, whatever each has a right to do individually, it by no means follows that the combination may not be brought about by such methods as to make its united action an unlawful means.

*Boycotting.*—The jury having found, as the evidence tended to show, that the plaintiffs were injured in their business by the withdrawal of

patronage through the action of the defendants' organization, which was held to unity of action by a system of fines and penalties against disobedient members, the plaintiffs are entitled to redress.

*Unlawful Means.*—The result is not affected by the fact, if it be a fact, that the members voluntarily joined the association and accepted the by-laws providing for the imposition of coercive fines, for the law sees in the membership of an association of this character both the authors and the victims of the coercive system.

*Unlawful Means.*—Moreover, it can hardly be supposed that the defendants' organization reached its present proportions without some previous use of the unlawful means referred to.

*Exemplary Damages.*—The exemplary damages found by the jury cannot be allowed, for, if ever recoverable against several defendants, they are only recoverable where all are shown to have been moved by a wanton desire to injure.

*Evidence.*—The holding of the court upon matters of evidence is stated in the opinion too concisely to admit of further condensation in the head-note.

CASE. Trial by jury at the September term, 1895, Washington county, *Start*, J., presiding. Verdict and judgment for the plaintiffs. The defendants excepted.

At the close of the testimony the defendants moved for a verdict for insufficiency of evidence. The motion was overruled.

The jury were permitted to include exemplary damages in their verdict, but were required to report the amount thereof separately.

*George W. Wing, C. A. Prouty* and *J. P. Lamson* for the defendants, cited, *State* v. *Johnson,* 40 Kan. 266; *People* v. *Parker,* 67 Mich. 222; *Spies* v. *People,* 122 Ill. 1; *Ford* v. *State,* 112 Ind. 373; *State* v. *Weaver,* 57 Ia. 730; *Benford* v. *Sanner,* 40 Pa. St. 9; *State* v. *Duncan,* 64 Mo. 262; *State* v. *Pike,* 51 N. H. 105; *State* v. *Ross,* 29 Mo. 32; *Reid* v. *State,* 20 Ga. 681; *Hunter* v. *Commonwealth,* 56 Am. Dec. 121; *State* v. *Arnold,* 48 Ia. 566; *People* v. *Irwin,* 77 Cal. 494; *Clemitt* v. *Watson,* 42 N. E. 367; *Manufacturing Co.* v. *Hollis,* 54 Minn. 223; *Cote* v. *Murphy,* 159 Pa. St. 420; *Commonwealth* v. *Hunt,* 4 Met. 111; *Heywood* v. *Tillson,* 75 Me. 225; *Manufacturing Co.* v. *Lumbermen's Association,*

21 L. A. R. 337; *Carew* v. *Rutherford*, 106 Mass. 1; *Jenkins* v. *Fowler*, 24 Pa. St. 308; *Longshore, etc., Co.* v. *Howell*, 26 Ore. 527; *Delz* v. *Winfree*, 80 Tex. 400; *Robertson* v. *Parks*, 76 Md. 118; *Kimball* v. *Harman*, 34 Md. 407; *Laverty* v. *Vanarsdale*, 65 Pa. St. 507; *Hunt* v. *Simonds*, 19 Mo. 583; *Bradley* v. *Pierson*, 148 Pa. St. 502; Cooley on Torts, 125, 126, 278; *Bowen* v. *Matheson*, 14 Allen 499; *Boston Glass Manufactory* v. *Binney*, 4 Pick. 425; *Walker* v. *Cronin*, 107 Mass. 555; *Steamship Co.* v. *McGregor*, L. R. 21 Q. B. 544; *Steamship Co.* v. *McGregor*, L. R. 23 Q. B. 598; *Schulten* v. *Brewing Co.*, 28 S. W. 504; *Randall* v. *Hazelton*, 12 Allen 415.

*W. A. Lord, John H. Senter* and *Dillingham, Huse & Howland*, for the plaintiffs, cited, *Oxley Stave Co.* v. *Coopers' Int. Union*, 72 Fed. R. 695; *Arthur* v. *Oakes*, 63 Fed. R. 310; *Callan* v. *Wilson*, 127 U. S. 540, 555; *State* v. *Glidden*, 55 Conn. 46, 75; *Temperton* v. *Russel*, L. R. (1893), 1 Q. B. D. 715; *State* v. *Stewart*, 59 Vt. 273; *State* v. *Dyer*, 67 Vt. 690.

MUNSON, J.  On the sixth day of June, 1893, the plaintiffs obtained a bond for the conveyance of a mill in Barre, equipped with machinery for polishing granite; and on the sixteenth day of the month they received a deed and took possession of the property, and became co-partners under the name of the Boutwell Polishing Company.  The mill had been operated for several years by the plaintiffs' grantor; and in the interval between the taking of the bond and the receipt of the deed, the plaintiffs saw the patrons of the mill and received assurances of a continuance of their custom, limited in the case of some patrons by the mention of an expectation or a possibility of their putting in polishing machines of their own.  From the time of their purchase until November the work of the mill averaged over one thousand dollars a month, that of the last month being but little below that amount.  In November the

receipts were some less than two hundred dollars. In December and January the mill was without work, and substantially all that it did after that was upon stock purchased by the company from parties outside of Barre. On the nineteenth of April, 1894, the mill was sold to one of the defendants. No complaint was ever made of the plaintiffs' work or their methods of business.

During this time there was an organization in Barre called the Granite Manufacturers Association, which embraced about ninety-five per cent. of all the granite manufacturers in the place. There was also an organization located at Boston, called The Granite Manufacturers Association of New England, with which were connected the local organizations of the New England states, including that at Barre. All the defendants held by the verdict were members of the Barre Association. Neither the plaintiffs' firm nor any of its members were connected with this or any similar organization. Prior to November, 1893, the Barre Association adopted by-laws which prohibited dealings with members not in good standing, and imposed fines for the violation of its rules. On the tenth of November, the Association endorsed a resolution previously adopted by the New England Association, which recommended that none of its members sell any rough stock, partly finished or finished granite, directly or indirectly, to any firm, individual or corporation, engaged in cutting, quarrying or polishing granite in any of the New England states or in New York city, and not a member of the Association. On the twenty-fourth of November, the Association adopted a resolution of the following terms: "Resolved, for the purpose of strengthening the Association, and [for] the mutual protection of its members, [that] no trade shall be conducted with any individual, firm or corporation, engaged in cutting, quarrying or polishing granite, in the State of Vermont, who are not members of this Association."

George Lampson, a defendant, testified that he assisted in

the formation of both associations, and had been connected with them ever since; that he was notified by a circular of the action taken November tenth; that the effect of that resolution would be that if a company declined to join the association, no member of the association would thereafter do any business with it. Alexander Gordon, another defendant, testified that he understood that the main reason for the collapse of the plaintiffs' business was the passage of the resolution; that he voted for it, and did so believing that it would have that effect on their business; that after its passage he stopped sending work to the plaintiffs, and that he did so because of that vote.

It appears from the testimony of some of the defendants that during the summer and early fall of 1893 they had several conversations with John W. Dillon, the manager of the plaintiffs' business, in regard to their becoming members of the Association, in which they expressed a desire to have them join. Mr. Kemp, one of the plaintiffs, testified that sometime in November, and after the loss of their business, defendant Kelliher asked him why they wouldn't join the Association, and said they would find out that they would have to join it before they could do any business. Mr. Senter, an attorney for the plaintiffs, testified that in December, defendant Eagan, on coming out from an interview with the plaintiffs, said to him that "they would find out they couldn't do any polishing business until they joined the Association." Mr. Kemp further testified that in January, 1894, he had two interviews with certain defendants, at their suggestion, in which the question of plaintiffs joining the Association was discussed at length. His testimony tended to show that the first of these meetings was with defendants Ady and Gordon, and that Ady remarked that the object of the interview was to see if they could induce the plaintiffs to join the Association, but that they hardly expected to get them to, as they supposed plaintiffs were still stubborn about joining; that later in

the conversation he used substantially these words, "I will admit that the effect of that resolution was to destroy the business of your company in one day, but it is my opinion that if you will join the Association you can get your business all back in one day," and that Gordon, on being appealed to by Ady, affirmed his statement; that the second of these interviews was with the defendant J. D. Smith, who said it was true that the action of the Association had had the effect to close plaintiffs' mill, but that he was perfectly confident that it could be started up with all their old customers at once, if they would join the Association.

The defendants have not brought up their exceptions to the charge, but stand on their motion that a verdict be directed for want of sufficient evidence to make them liable. There was clearly evidence tending to show that the defendants undertook to compel the plaintiffs to join the Association by depriving their mill of work, and that they made use of their organization, as a means of concerted action, to accomplish their purpose. But there was no evidence tending to show that the defendants made any attempt to compel persons, not members of the Association, to withhold their patronage, and they insist that they cannot be made liable for simply withholding their own.

The crime of conspiracy consists in a combination of two or more persons to effect an illegal purpose, either by legal or illegal means, or to effect a legal purpose by illegal means. *State* v. *Stewart,* 59 Vt. 273. But the grounds of recovery in a civil suit are not identical with the elements of the crime. The law punishes the mere agreement to effect an illegal purpose or to use illegal means. But it is clear that a civil action cannot be sustained unless something causing damage to the plaintiff has been done in furtherance of the agreement; and it is claimed to be also requisite that the thing done be something unlawful in itself. This would preclude a reliance upon the existence of an illegal purpose, and require that the means used be

illegal. The agreeing together to effect an illegal purpose being itself illegal, it might seem that any act done in furtherance of the agreement and resulting in damage, even though not itself a violation of right, would sustain a recovery. But the view suggested is not sustained by the authorities, and we proceed with our inquiry upon the assumption that there can be no recovery unless illegal means were employed.

It is clear that everyone has a right to withdraw his own patronage when he pleases, but it is equally clear that he has no right to employ threats or intimidation to divert the patronage of another. If it be true as a general proposition that several may lawfully unite in doing to another's injury, even for the accomplishment of an unlawful purpose, whatever each has a right to do individually, it by no means follows that the combination may not be so brought about as to make its united action an unlawful means. The defendants insist that as members of the association they had a right to resolve to keep their work among themselves, and that in the absence of anything tending to show an attempt on their part to influence the action of others, they cannot be held liable. It may be true that if the defendants, acting independently of any organization and moved solely by similarity of interest and views, had united in withdrawing their patronage, the effect upon the plaintiffs' business would have been the same, and yet the defendants have incurred no liability. But in the case supposed the united action would result from the free exercise of individual choice. It will be seen upon further inquiry that this cannot be said of the action of an organization like that operated by the defendants.

It is true, as suggested in argument, that every one engaged in business is liable to have it injured or destroyed by the action of those upon whom he depends for patronage. But when those upon whom he depends for patronage are acting as individuals, he has a measure of security in the

probability that different preferences will be shown by persons left to their own choice; and if some who desire to injure his business secure the cooperation of others by unlawful means, the law gives him a remedy. If the defendants are right, he can be deprived of this security and this remedy by converting those who desire his injury into the majority of an association, and those who do not into a suppressed minority, held to the designated course by the pressure of a system of fines and penalties. But giving a new face to an old wrong can never defeat the remedy, for the law will inquire as to the substance of the thing complained of. If the plaintiffs were in fact injured by a forced withdrawal of patronage secured through the action of defendants' organization, they are entitled to redress. Without undertaking to designate with precision the lawful limit of organized effort, it may safely be affirmed that when the will of the majority of an organized body, in matters involving the rights of outside parties, is enforced upon its members by means of fines and penalties, the situation is essentially the same as when unity of action is secured among unorganized individuals by threats or intimidation. The withdrawal of patronage by concerted action, if legal in itself, becomes illegal when the concert of action is procured by coercion. In this case, it could easily be found that a fine of fifty dollars for a violation of the rules was not intended to be applied to rules adopted to secure a performance of the ordinary duties of membership. If in fact designed to hold unwilling members to unity of action in an aggressive movement of unlawful character, the defendants cannot complain if the law so treats it. The jury could properly infer from the nature and management of the defendants' organization that their united action was due in part to the means adopted to secure it. The force of the measure resolved upon lay partly in the fact that the by-laws threatened penalties against any who should fail in carrying it into effect.

The fact that the members of the association voluntarily assumed its obligations in the first instance, so far as it be a fact, is not controlling. The law cannot be compelled by any initial agreement of an associate member to treat him as one having no choice but that of the majority, nor as a willing participant in whatever action may be taken. The voluntary acceptance of by-laws providing for the imposition of coercive fines does not make them legal and collectible, and the standing threat of their imposition may properly be classed with the ordinary threat of suits upon groundless claims. The fact that the relations and processes deemed essential to a recovery are brought within the membership and proceedings of an organized body, cannot change the result. The law sees in the membership of an association of this character both the authors of its coercive system and the victims of its unlawful pressure. If this were not so, men could deprive their fellows of established rights, and evade the duty of compensation, simply by working through an association. But it can hardly be supposed that the defendants' organization reached its present proportions without some previous use of the methods disclosed by the evidence above recited; and as far as its membership was due to coercion, there was a further element of unlawful pressure in the enforcement of united action against the plaintiffs. It would be strange indeed if the members of an association, organized upon such a basis and advanced by such means, could meet a claim of this nature by saying that they had made no attempt to secure the cooperation of outside parties. It is clear that if the association had comprised but a small portion of the manufacturers, and had destroyed the plaintiffs' business by compelling other manufacturers to join them in withholding patronage, its members would have been liable. But it is claimed, in effect, that a business can be destroyed with impunity, when the organization has become so extensive that there are no outside patrons to

control, or so few that their course is a matter of no moment. Upon this theory, every successful instance of coercion would increase the safety with which another coercion could be attempted, and when coercion had been pursued until but one contumacious person remained, immunity would be complete. It is clear that the law cannot concede to organizations of this character the powers and immunities claimed for their association by these defendants, and retain its own power to protect the individual citizen in the free enjoyment of his capital or labor.

The evidence excepted to was properly admitted. Evidence that defendants individually expressed a purpose to continue to patronize the mill, in connection with evidence that they did so without complaint until the general withdrawal, was evidence tending to characterize the withdrawal when made. The items offered as showing the profit of the mill tended to establish the damages according to the rule adopted by the court, and no question is now made as to the correctness of that rule. Evidence of the existence and rules of the New England Association was admissible because of the connection of that body with the local organization. The resolution and by-laws of the Barre Association, the agreement of that association with the Boston Wholesalers Association in restriction of the sales of its members, the appointment of a committee to inquire as to violations of its rules, the official correspondence had with one of its members upon that subject, the fact that a fine was imposed for an ascertained violation, and the action of the association in assuming the defence of its secretary when sued because of a letter written in respect to an alleged violation,—were all admissible as showing the purpose and use of the organization, and its coercive character as against its own members. The statements of different defendants indicative of their purpose, and of members of the association not defendants as to the force

and effect of the vote, made contemporaneously with and in explanation of their action under it, were clearly admissible.

The case stands upon grounds which are inconsistent with the allowance of exemplary damages; for damages of this nature, if ever recoverable against several defendants, are recoverable only where all are shown to have been moved by a wanton desire to injure. The exemplary damages were separated by a special verdict, but were included in the judgment rendered.

*Judgment reversed, and judgment for actual damages with interest from date of judgment below.*