ALFRED W. BOOTH & BROTHER

*v.*

JOHN R. BURGESS et al.

[Decided November 22d, 1906.]

1. A manufacturer of building materials declared for the open shop, and its employes, who were union men, struck. The labor organizations embracing the building trade, through their officers, notified the boss carpenters that the manufacturer's goods were unfair, and that members of the unions would not handle them, and if a boss carpenter received them his employes would be called out. Some of the boss carpenters broke their contracts with the manufacturer, and others, who had been its regular customers, refrained from using its goods. The scheme of the officers of the unions included coercion of the employes of the boss carpenters to strike against their will.—*Held*, that the manufacturer was entitled to an injunction restraining the officers of the unions from directing or inducing by threats, &c., the employes of the boss carpenters to strike.

2. Where a third person intentionally, by the use of any kind of means, causes a breach of contract involving damage, he is *prima facie* guilty of a tort.

3. Every dealer is entitled to a free market, and to enjoy the right he must have all other dealers with him left free to deal or not, as they may voluntarily elect, and a violation of the right consists in coercing the market.

4. It is the absolute right of all men to contract or refrain from contracting, and the motives which actuate a man in refraining from making a contract in relation to labor or merchandise, or anything else, are beyond inquiry.

5. Men have an absolute right to act in voluntary combination in respect to contracting or refraining from contracting, however immoral their motives may be.

6. A manufacturer of building materials declared for an open shop, and its employes struck. The labor organizations embracing the building trades, through their officers, notified the boss carpenters that the manufacturer's goods were unfair, and that the members of the unions would not handle them. The scheme of the officers of the unions included the coercion of the employes of the boss carpenters to quit work in case materials were purchased from the manufacturer. The coercion, if exercised, would be exercised in accordance with the regulations of the unions.—*Held*, that the officers of the unions were not justified in interfering with the manufacturer's market by coercion exercised on the employes of the boss carpenters.

On motion for a preliminary injunction. Heard on bill with annexed affidavits and answer with annexed affidavits.

*Mr. Charles E. Hendrickson, Jr.,* and *Mr. Charles L. Corbin,* for the motion.

*Mr. John J. Mulvaney, contra.*

STEVENSON, V. C.

Upon the motion papers as they stand, counsel for the complainant applied for an injunction merely to enjoin the maintenance of a boycott. The motion for a wider preliminary injunction indicated by the order to show cause was abandoned.

The complainant is a corporation under the laws of New Jersey carrying on the business of lumber dealers and manufacturers of doors, blinds, trim and other mill work used in the erection of buildings. Its customers are boss carpenters and building contractors. It owns its yard and mill, which are situate at Bayonne, in Hudson county, and the value of its plant and stock on hand is over $200,000. It employs about twenty-five hands.

The defendants against whom a preliminary injunction was prayed for are officers and agents of the labor organizations which embrace the building trades of Hudson county. These trades are organized in the usual way, in local unions, a district council composed of delegates from all the local unions in Hudson county, and a united brotherhood composed of all the local unions throughout the United States and Canada belonging to the order, which local unions, however, are represented in the convention or governing body of the united brotherhood by delegates.

Consequent upon a dispute as to hours of labor and wages between the complainant and its employes, the complainant "declared the open shop," the employes struck, and thereupon the complainant became involved in a contest with the whole system of labor unions in Hudson county connected with the building trades, embracing between two and three thousand workmen. The complainant became "unfair," and all its products likewise

became "unfair." The labor organizations, through the defendants, their officers and agents, have notified the boss carpenters and builders that the complainant's goods are "unfair," and that members of the unions will not handle them, and that if they receive or use any of this unfair material their employes will be called out, and thus they are confronted with loss, if not ruin, in case they persist in dealing with the complainant. Under this coercion certain boss carpenters have broken their contracts with the complainant, under which they were receiving the complainant's goods, and, what is of more consequence, other boss carpenters and builders, who had been regular customers of the complainant, have been constrained to refrain from using its goods on their jobs, inasmuch as the inevitable result of such use would be that all their employes who are members of these allied labor unions would immediately be called off and forced into a strike.

It is a fact of the utmost importance, in my judgment, in this case—a fact which I think is absolutely essential to the granting of the most important part of the injunctive relief prayed for by the complainant—that the defendants' scheme for coercing the boss carpenters to conduct their business as they (the defendants) wish to have it conducted does not involve merely the voluntary action of the employes of the boss carpenters, individually or in combination, and the announcement of such voluntary action or intended voluntary action. The scheme includes the *coercion* by the defendants of the employes of the boss carpenters. These workmen are to be forced to strike against their will whenever the defendants shall say the word. The coercion consists in the fact that if any workman refuses to strike he is liable to a fine, and also to expulsion from his union. Expulsion from the union subjects the victim not only to obloquy, but also to pecuniary loss, and makes it more difficult for him to get employment and make his living, as is amply illustrated in this case.

It does not appear that the boss carpenters are greatly injured or inconvenienced by being obliged to refrain from dealing with the complainant. It may be inferred that these contractors are able to supply themselves with goods of the class which the com-

plainant manufactures from other sources, and hence they seem to be inclined readily to submit to the coercion of the defendants. Their attitude is precisely the same as that of Mr. Munce in *Quinn* v. *Leathem, infra.*

The pecuniary loss from this boycott falls directly upon the complainant, and it is evident that this loss is of such an extent and nature as will warrant the use of the injunctive power of a court of equity, provided such loss is caused by conduct of the defendants which is unlawful.

Upon the filing of the bill and annexed affidavits an order was made requiring the defendants to show cause why an injunction should not issue according to the prayer of the bill, upon the return of which order the defendants appeared and filed an answer and affidavits. After hearing an elaborate argument by counsel, I advised an order for an injunction restraining the defendants

"from calling out or directing to strike any employe or employes of the complainant's customers, or persons who were willing to deal with the complainant, with the intent or with the effect to coerce or induce by fear of loss such customer, or persons willing to deal with the complainant, to break their contracts with the complainant, or to refrain from dealing with the complainant; and also restraining the defendants from coercing or inducing such employes by fine or expulsion from a labor union, or by threat of such fine or expulsion, to refrain from being employed by such customers with the intent or effect aforesaid."

An appeal having been taken from this order to the court of errors and appeals, it is necessary that I should set forth the "reasons" of the order.

1. The order, I think, is sustained by authorities which are controlling in this court until the court of errors and appeals has been heard from. While a number of injunctions against boycotts have been issued from this court, and opinions in these cases have been published, no boycott case has as yet been decided by our court of last resort. That the injunction issued in this case is sustained by the prior decisions of this court, and by a great weight of authority in other states and in England, will appear, I think, beyond question from an examination of the following cases:

*Barr* v. *Essex Trade Council, 53 N. J. Eq. (8 Dick.) 101 (1894)* ; *Martin* v. *McFall, 65 N. J. Eq. (20 Dick.) 91 (1903)* ; *Jersey City* v. *Cassidy, 63 N. J. Eq. (18 Dick.) 759 (1902)* ; *Sherry* v. *Perkins, 147 Mass. 212 (1888)* ; *Plant* v. *Woods, 176 Mass. 492 (1900)* ; *Moran* v. *Dumphy, 177 Mass. 485 (1901)* ; *Berry* v. *Donovan, 188 Mass. 353 (1905)* ; *My Maryland Lodge* v. *Adt, 59 Atl. Rep. 721 (1905)* ; *Boutwell* v. *Marr, 71 Vt. 1 (1899)* ; *Curran* v. *Galen, 152 N. Y. 33 (1897)* ; *Temperton* v. *Russell, L. R. 1 Q. B. 715 (1893)* ; *Quinn* v. *Leathem, A. C. 495 (1901)* ; *Giblan* v. *National Amalgamated Union, 2 K. B. 600 (1903)* ; *Glamorgan Coal Co.* v. *South Wales Miners' Federation, 2 K. B. 545 (1903)*.

2. I might safely rest upon the controlling authority of the cases above cited without attempting any discussion of the principles which they announce, and which they are supposed to illustrate, if it were not for the fact that courts and judges in these cases, even when agreeing in results, often differ widely in their reasons.

Under the circumstances I shall endeavor, as briefly as possible, to set forth the legal propositions which seem to me to be sound and adequate to sustain the order which was made in this case. Many of the views herein set forth may perhaps be found to be erroneous by our court of last resort, and yet the order appealed from may be affirmed upon some of the principles promulgated in some of the above-cited cases, which principles I have rejected or found unnecessary to be considered.

Of course, it has been argued that the law of this case is in doubt, and hence no injunction should go. I do not think that this rule of procedure can be applied to thwart the complainant in its effort to have its whole case investigated and decided by the courts of this state in the most convenient and inexpensive manner. The authorities which now bind this court agree, I think, that the complainant is entitled to an injunction in the terms of the order. That is the law of the case—the settled law of the case—according to the prior decisions of this court, which, in the absence of any deliverance by the court of errors and appeals, must be deemed controlling. The fact that the reasons and reasonings and principles announced in the New Jersey

cases, or the American cases, or the English cases, or in all these cases, are variant, inconsistent, or even contradictory, and are still subject to free discussion and criticism, does not affect the fact that it is the settled law of New Jersey, entirely free from doubt at the present time, so far as this court is concerned, that the complainant in this case has a primary legal right, whatever the definition of that right may be, which the defendants have violated, and that the injunction which has issued from this court is the complainant's appropriate remedy.

3. A large part of the confusion and conflict among the boycott and strike decisions in this country and in England has arisen, I think, from the attempt which judges have made to define the delict, the tort, of the defendant in this class of cases without first analyzing the case so as to discover the right of the plaintiff or the correlative duty of the defendant, the invasion of which right and the violation of which duty constitute the tort to be defined. It is true that the law of torts has been developed in precisely this way. Sir Frederick Pollock remarks that "law begins not with authentic general principles, but with enumeration of particular remedies." *Poll. Torts 16 ch. 11.* Judges and text-writers, in elaborating the law of negligence, have at different times undertaken a definition of the tort of the defendant with which they were dealing without apparently bestowing the slightest regard to the underlying right of the plaintiff or its correlative duty resting upon the defendant, the existence of which, of necessity, was assumed. Some of these definitions have very little if any value, and some of them are false and misleading. Plainly there can be no tort committed by a defendant unless some right of the plaintiff has been thereby invaded. In the case of *Heaven* v. *Pender, L. R. 11 Q. B. Div. 507 (1883),* Lord Escher (then Master of the Rolls Brett) illuminated the whole law of negligence by an analytical discussion, in which the primary right of the plaintiff or the correlative duty of the defendant in a negligence case is disclosed and formulated.

If the great English judges who delivered these exceedingly instructive and learned opinions in *Allen* v. *Flood, A. C. 1 (1898),* had devoted more time to the ascertainment of the legal

right, or the alleged legal right, asserted by the plaintiff, the violation of which constituted the tort charged against the defendant, I incline to think that they would have had less difficulty in ascertaining whether or not any tort had been committed, and, if so, what was the definition of such tort. The effort of a large number of learned judges to define a tort without agreeing upon the primary legal right which the tort postulates, especially when such effort is made with the use of such terms as "malice" and "maliciously," naturally leads to variant and conflicting opinions. While I shall not undertake at present to criticise the procedure of the English courts in this remarkable case, the history of the case from court to court perhaps presents the best illustration of the point which I am endeavoring to make, viz., that when a novel tort is recognized, and a remedy therefor is provided by the action of the courts, and such tort does not seem to belong to one of the ancient classes, which are labeled, and to which certain definite remedies are assigned, such as fraud, trespass or nuisance, it may be suspected that a novel right and its correlative duty have been consciously or unconsciously asserted, and that therefore the first thing to do is to discover and define that right and that duty. A definition of the right involves a definition of the duty, and vice versa, and oftentimes whether the one or the other shall be defined is a mere matter of convenience. See *Heaven* v. *Pender*, supra.

4. The primary legal right which it seems to me should be recognized as belonging to the complainant in this case may be defined or described as the *right to a free market*. In the case of *Jersey City Printing Co.* v. *Cassidy, supra*, in which a purchaser of labor in the market was interfered with and injured by conduct of the defendants, which coerced sellers of labor to refrain from dealing with him, the complainant, as they otherwise would have done, I endeavored to define the same right which it seems to me is presented in this present case. My opinion in that case, though hurriedly formulated, was the result of a very careful examination and consideration of the authorities, and I now refer to it without undertaking to repeat or restate at length the matters therein contained.

For the purposes of this present inquiry I think there are three rights, the violation of each of which is a distinct tort, which must be fully recognized and carefully distinguished.

*First.* We have the right in a contract. Our law now recognizes a contract right as property which is to be protected against undue interference by persons not parties to the contract. When a third party intentionally, by the use of any kind of means, causes a breach of the contract involving damage, he is *prima facie* guilty of a tort. The right, however, is not absolute. Circumstances may exist which cause the right to cease to exist. These circumstances are said to amount to a justification or excuse on the part of the person who has caused the breach of contract. There may be no harm in calling these exceptional facts a justification, and the use of such phraseology is certainly sustained by abundant analogies. When these definitions of rights are laid down what, in fact, is done is to describe what is *prima facie* a right, leaving for each case the question whether some further fact or facts not included in the definition do or do not take the case out of the scope of the definition. There is no justification for a tort. The so-called justification is an exceptional fact which shows that no tort was committed. Such exceptional fact makes the case an exception to the definition of the tort.

*Second.* We have the right to contract or to refrain from contracting. No man can exercise the right to contract except when he finds another man who in the exercise of his similar right is willing to contract with him. Whether an individual can commit a tort by violating the right to contract belonging to another we need not consider. The common instance of the violation or attempted violation of this right is where the state intervenes and undertakes arbitrarily to penalize the exercise of this right in certain particular cases.

*Third.* We have the right to a free market which is the right of every dealer, in the full enjoyment of his right to contract, to have all other possible dealers with him left free to deal or not as they may voluntarily elect. Thus recognition is accorded to the "interest which one man has in the freedom of another." *Jersey City Printing Co.* v. *Cassidy, supra,* 765.

The tort exhibited by the violation of the right to a free market consists in coercing the market, i. e., interfering with the right of a particular dealer to enjoy the advantages of *freedom* to deal with him on the part of all who may voluntarily desire to deal with him.

As in the case of the first right above mentioned—the right to enjoy the fruits of a contract as property—so also in this instance exceptional circumstances may make the right to cease to exist, and for convenience and in accordance with the analogies of the law such exceptional circumstances .may be deemed as constituting a justification or excuse.

A fourth right, or a wide extension of the right above defined as the right to a free market, has undoubtedly been involved in if not expressly recognized by the decisions of some courts in strike and boycott cases. This wider right concedes to every man not only a *free* market but a market where transactions occur naturally according to the ordinary laws of trade and commerce, unaffected, not only by coercion, but also by persuasions or non-coercive inducements *from outside parties* applied by them with intent and with the effect to interfere with his dealings and thereby to cause him damage. Whether in New Jersey, upon a further development of the law, such a wider right will be recognized and the tort which consists in its violation will be restrained by injunctions, need not be considered in this case. No such injunction is asked for in this cause because the sole grievance of the complainant against the defendants is that they are practicing coercion in the market which is not only powerful but almost irresistible.

In many of the reported cases, including *Allen* v. *Flood* and *Quinn* v. *Leathem,* the tort which is generally described as "maliciously inducing" the dealer in the market to break his contract with the plaintiff to the plaintiff's damage, is discussed concurrently with the very different delict which is described as "maliciously inducing" a dealer in the market to refrain from contracting with the plaintiff to the plaintiff's damage. In the one case we have violation of the ordinary right in a contract which is a form of the right to the possession and enjoyment of property, and in the other, where the inducement is

coercive, we have a violation of the right to a free market. Without discussing the imperfect or vague description of these delicts arising from the use of that misleading word "maliciously," I desire now to point out merely that the effort to discuss at the same time two such different things would seem inevitably to lead to error and confusion. In the case now before this court we have presented both the right in a contract and the right to a free market, and the torts which consist respectively in the violation of those rights. But there is no suggestion made on the part of the complainant that its right to the enjoyment of its contracts has been violated by the defendants in any other way than by coercion. No case of "malicious" persuasions or "malicious" non-coercive inducements *causing* the breach of a contract, is suggested in the complainant's bill. It was not necessary in the order for the injunction to frame a separate prohibition with reference to the threatened breach of existing contracts as might have been the case if the bill had alleged that the defendants were violating the complainant's property-rights in contracts by *causing,* otherwise than by coercion, the parties to those contracts to break them.

5. We now approach the discussion of the facts of the case in hand, and in such discussion we must bear in mind at every stage two principles which, I think, at the present day, are established beyond question.

The first of these principles is the absolute right of all men to contract or refrain from contracting, which is one of the rights hereinbefore enumerated. The motives which actuate a man in refraining from making a contract in relation to labor or merchandise or anything else are absolutely beyond all inquiry or challenge. Self-evident as it may be, the proposition, I think, has often been lost sight of that the right to refrain from contracting is an absolute right, which every man can exercise justly or unjustly, for a good purpose or for a bad purpose, "maliciously" in the popular sense of the term, or benevolently.

The second principle to keep in view is not at present universally recognized as sound law, viz., that men have an absolute right to act in voluntary combination with respect to contracting or refraining from contracting. No doubt there is

authority for the proposition that defendants, by combining with a "malicious" intent to exercise together the right to refrain from contracting, may be guilty of a tort—of a violation of a right held by the party damaged by such combined abstention from contracting. Passing the defect in the formulation of this proposition, I can only repeat what I attempted to set forth in deciding the case of *Jersey City* v. *Cassidy,* that it seems to me that the settled American doctrine, apart from all recent statutes, is that all dealers in the market, whether in merchandise or in labor, on each side of the market, have an absolute right to combine voluntarily to concurrently exercise their several rights to refrain from contracting if they see fit to do so, however immoral their motives may be. If this is not good law, then the right to refrain from contracting is subject to a most extraordinary limitation which leads to absurd results. It may be worth while to note precisely what a free combination of employers or employes or vendors or purchasers actually do when, for the purposes of a strike or a boycott, they concurrently exercise by agreement their several and respective rights to refrain from contracting. They are not combining, as is sometimes erroneously supposed, *to do* anything, much less to do the same thing; they are merely agreeing voluntarily that each of them will *refrain* from doing a certain thing which is precisely similar to another thing which each of the others in like manner will refrain from doing. If they commit any tort, *i. e.,* any actionable wrong, it consists essentially in nonfeasance, not misfeasance—refraining from doing anything, not doing anything. Let us suppose that it is established as law that the combined *action* of a large number of persons may be so productive of evil as to make these persons civilly liable for a tort, which may be defined as a "malicious" or unjustifiable conspiracy to injure one in his business, even though precisely the same harmful conduct pursued to the extent possible by a single individual would not involve him in any liability whatever. This, it seems to me, is substantially the proposition which the judges or the most of the judges in *Quinn* v. *Leathem* considered as underlying one of the causes of action established in that case. The five officers and agents of the labor union were

found guilty of conspiring to instruct, *i. e.,* to positively direct the employes of Mr. Munce to refrain from dealing with him. This was held to be a misfeasance. The five defendants were not charged with combining to refrain from acting or to refrain from doing anything. When, however, we pass to a voluntary combination of Mr. Munce's employes to refrain from renewing their contracts for service with him, we have a clear case of nonfeasance. It seems to me that there is a very wide distinction between an unlawful conspiracy to do things which each one of the conspirators by himself has an absolute right to do on the one hand, and an unlawful conspiracy merely to refrain from doing things which no one of the conspirators is under the slightest obligation to do. The moment it is established that one man has an absolute right to refrain from contracting, and that his motives are beyond all challenge, I am entirely unable to perceive how a voluntary agreement between two men that they will severally and at the same time exercise this absolute right, can be erected into a tort involving liability for damages. Without for a moment conceding that either of the so-called conspiracies above contrasted can constitute a tort, I desire to point out that even if the first-mentioned conspiracy is held to be a tort in accordance with the views of the judges in *Quinn* v. *Leathem,* a great extension of the doctrine is necessary before the other conspiracy, the conspiracy of nonfeasance, the conspiracy to refrain from doing, can be adjudged such tort. If dealers in the market who voluntarily combine to refrain from contracting with intent to damage some one in his business are guilty of a tort, it must be that some or all of them are under an obligation to contract. It seems hardly possible that two or more persons may be liable for damages resulting from their failure to act unless they were legally bound to act. It did not require the judgment of the house of lords in *Allen* v. *Flood* to make clear the rule that when men, either singly or in combination, intentionally pursue a line of conduct which they have a right to pursue, the existence of an immoral or a "malicious" motive cannot make such conduct unlawful.

But I do not think that it is worth while in this country to waste time at the present day, and especially in view of the

statutes which have very generally been enacted, in vindicating
the absolute right of every dealer in the market to refrain from
contracting, and to so refrain by voluntary agreement concur-
rently with similar abstention from contracting on the part of
a thousand or ten thousand other dealers in the market. Hence
it follows that a free boycott which causes enormous financial
loss to its victim may be entirely without remedy either in a
court of equity or a court of law. Whatever views may be enter-
tained on this subject, it seems plain that there can be no prac-
ticable remedy in equity for such a voluntary boycott. No
mandatory injunction will issue to compel men to deal who are
refraining from dealing. An injunction to compel a number of
men to buy goods or to go to work would be contrary to a well-
settled rule, and would be a juridical curiosity. An injunction
prohibiting a number of men from "conspiring" to refrain from
dealing, when each of these men is absolutely free to so refrain,
would also, it seems to me, be not only an anomalous and
abortive procedure, but a dangerous attempt to interfere with
conduct which is, and ought to be, beyond legal control—conduct
which the law leaves subject to social and ethical influences
only. Communities where men are guided in their dealings in
the market by unscientific, impolitic or immoral principles are
bound to suffer as compared with communities where correct
and liberal principles are recognized as controlling in business
affairs. Courts of equity do not attempt to enforce the golden
rule, or even sound principles of commercial morality or ex-
pediency, by the writ of injunction.

Coming now to the facts of the case before this court we find,
at the beginning of the line of dealers whose right to contract
and right to a free market must be recognized, the complainant,
a manufacturer and an employer of labor, on the one hand, and
a free combination of about twenty-five former employes of the
complainant on the other. No one has suggested in this case
that these two parties are not wholly within their respective
rights in the conduct which they have voluntarily pursued. The
motives of the free combination of employes for refusing to
renew their contracts of employment, whether moral or im-

moral, "malicious" or benevolent, are entirely beyond judicial inquiry.

Passing a step further we find the customers of the complainant, the boss carpenters and contractors of Hudson county. If these boss carpenters voluntarily combine to refrain from purchasing goods from the complainant, they would thereby violate no right of the complainant, and the complainant would have no action at law or in equity against them, notwithstanding the fact that this combined action, this entirely voluntary boycott, might cause great damage to the complainant in its business. These boss carpenters might notify the complainant that if it employed non-union workmen they would cease to deal with it, or they might by their threat of a voluntary removal of their custom in any other way dictate to the complainant how its business should be conducted, and in fact coerce the complainant to discharge its non-union hands and re-employ the strikers. That such coercion cannot constitute the tort with which we have to deal has sometimes been overlooked. In such case the plaintiff's right of free market is not violated. The boss carpenters are simply exercising their absolute right to refrain from contracting. Each of the two dealers is free, and each has the full advantage of the freedom of the other.

Passing still a step further we come to the employes of the boss carpenters. We have now four parties to the affair in hand, and the situation has become more complex, but, after all, there is no difficulty, it seems to me, in solving the problems which the situation presents. The employes of the boss carpenters, in the exercise of their absolute unquestionable right to refrain from being employed, and their further unquestionable right to do this thing in voluntary combination, may, from good motives or bad motives, notify the boss carpenters that if they take "unfair" material from the complainant they will cease to renew their contracts of employment, and thus the boss carpenters may be coerced to refrain from dealing with the complainant, and this coercion may in turn coerce the complainant to discharge its non-union men and take back the strikers. Still we have no case of coercion which can constitute the tort with which we are dealing, because at the very basis of the entire series of transac-

tions which we are examining we find only a free combination of dealers exercising their absolute right to refrain from dealing, so that all inquiry into motives is excluded. The tort under consideration, which necessarily involves coercion, consists in a violation of some dealer's right to a free market. In the case which we have now reached there is no such right belonging to the complainant or to its customers, the boss carpenters, which is in any way invaded. Coercion which results, however, directly and intentionally from the exercise of the absolute right to refrain from contracting cannot possibly be a tort, because it violates no legal right. It is a mere incidental result of the assertion and enjoyment of a right.

Taking one more step, at last we come to the defendants. If it appeared that these defendants, individually or in free combination, were merely exercising their right to refrain from contracting, then, no matter how damaging to the complainant such conduct might be, no right of the complainant would be violated, and the defendants would be guilty of no tort.

I know of no reason why the chain which I have been following up, link by link, might not be indefinitely extended. The employes of the boss carpenters in turn might be constrained by a most powerful coercion to refrain from continuing in the employ of their masters by a voluntary combination of other dealers in labor or merchandise, but if this last set of dealers were merely exercising their absolute right to refrain from contracting with the employes of the boss carpenters, unless these employes submitted to their dictation, it seems to me beyond all question that we have not yet reached any tort, or found anyone liable to an action at law or in equity for the relief of any of the parties in this long chain, no matter how enormous the pecuniary damage of such party might be.

But, in fact, we have come to the end of the chain, and we find that the powerful coercive force originating there which draws dealers away from the complainant at the other end of the chain is not the voluntary exercise of the right to refrain from contracting. The pull at the far end of the chain is given by the defendant Burgess, the business agent of this powerful labor organization in Hudson county, when he snaps his fingers, and

the employes of the boss carpenters against their will are coerced to refrain from renewing their contracts for labor with their employers by the fear of fines, expulsion from their labor unions, social ostracism and poverty.

6. The last question to be considered which is presented by the facts of this case is whether there is any justification shown for the interference with the complainant's market by the coercion exercised upon the employes of the boss carpenters by these defendants or the labor organization which they represent.

It may be conceded that the coercion may be justified, and hence may not constitute a violation of anyone's right to a free market, precisely as persuasions and inducements may be justified so that they cannot constitute the tort which consists in *causing* the breach of a contract.

The concrete question in this case is whether these employes of the boss carpenters, by voluntarily joining these labor unions. and subjecting themselves to the by-laws and regulations of these unions, and the control of its officers and agents, deprive the coercion which is exercised upon them of all illegal taint. This is the only question in this case which seemed to me to be open to debate. In the first place, it must be borne in mind that the boss carpenters are not here in court making any complaint. The coercion was exercised upon them, and they may have suffered on that account, but it is not their grievance which is being redressed in this suit. As we have seen, it is the interest of the complainant in their freedom to deal in the labor market, and not their own interest in their freedom to deal in that market which this court in this suit is asked to protect. Suppose it be conceded that these employes may surrender their liberty to the arbitrary power of this immense organization, and agree that this power can be exercised whenever a business agent of the organization speaks the word. They can only surrender the interest which they themselves have in their liberty.

I certainly do not propose to question the lawfulness of fining or expelling and consequently threatening to fine and expel members of labor unions who disobey the laws to which they have voluntarily subjected themselves. It is impossible to give the time necessary for an exhaustive discussion of this some-

what novel subject. Let it be conceded for the purposes of this case that labor unions may lay down many rules for the guidance of employers in the conduct of their business and prohibit by by-laws or otherwise their members from working for employers who disregard those rules. Employers, for instance, who expose their employes to dangerous machinery or unwholesome conditions may find that they cannot readily employ union men, and union men who, in violation of the by-laws of their unions, engage themselves to such employers, may be exposed to fines or expulsion from their unions. These and other similar cases, the status of which in the eye of the law I do not pause to consider, present the use of the penalties of fine and expulsion for the purpose of advancing the legitimate objects of the union.

When, however, the threat of fine and expulsion is employed for the purpose of coercing the employes of a large number of different employers to refrain from renewing their contracts for labor in order to coerce all these employers to boycott the complainant, with the ultimate object of coercing the complainant in respect of a matter with which the employes who are first coerced have absolutely no concern whatever, then it seems to me the whole scheme becomes an attack upon the complainant's right to a free market. No surrender of liberty or voluntary agreement to abide by by-laws on the part of the employes who are first coerced, made by them when they enter their labor unions, can, in my judgment, affect the right of the complainant to a free market, which right he will enjoy for all it may be worth if these employes are permitted to exercise their liberty. The employes may be able to surrender their own right, but they certainly cannot surrender the right of other parties. *Boutwell* v. *Marr, supra,* and *Berry* v. *Donovan, supra,* I think fully sustain the view that no justification has been shown in this case.

If two thousand five hundred workmen in Hudson county could, by permitting themselves to be organized into labor unions, surrender not only their own right to freedom in respect of making contracts, but also destroy the interest of all

other dealers in that freedom, the whole foundation of the right
to a free market would be swept away.

7. Other theories have been advanced to sustain injunctions
in strike and boycott cases similar in scope to the one which was
issued in this case, and also injunctions of much wider scope.
There is authority for the proposition that all men have a legal
right "freely to pursue their lawful calling"—per Justice Haw-
kins, afterwards Lord Brampton, *Allen* v. *Flood, A. C. 16 (1898)*
—which right has otherwise been stated as the "liberty" of every
man "to earn his own living in his own way." Per Lord Lind-
ley, *Quinn* v. *Leathem, A. C. 534 (1901)*. The tort, which con-
sists in the violation of this right, is generally defined or de-
scribed as the "malicious" doing of anything causing damage to
a man in his business or in the enjoyment of his means of liveli-
hood "without justification or excuse."

I incline to think that such generalizations are too wide to
have much of any practical utility, and that the result of their
use is simply that nothing is decided in any case until the ques-
tion of justification or excuse is settled. Lord Herschell, in de-
livering his opinion in *Allen* v. *Flood,* says: "In my opinion, a
man cannot be called upon to justify either act or word merely
because it interferes with another's trade or calling, any more
than he is bound to justify or excuse his act or word under any
other circumstances, unless it be shown to be in its nature
wrongful, and thus to require justification." *A. C. 139 (1898)*.

The use of the word "malicious" in the definition of the class
of torts under consideration seems to me to lead inevitably to
error and confusion. One definition of malice, which was quoted
with approval in *Allen* v. *Flood,* makes it mean "a wrongful act
done intentionally without just cause or excuse." *A. C. 18,
94 (1898)*. This definition is manifestly inaccurate, because no
just cause or excuse can be allowed for any *wrongful* act. If
we substitute in the definition of malice the phrase "an act
causing damage" for the phrase "a wrongful act," then the defi-
nition which we are considering would stand as follows: "The
intentional doing of any act which causes damage to a man in
the prosecution of his business or the enjoyment of his means of

livelihood, without justification or excuse, is malicious, *i. e.,* unlawful, and therefore actionable."

Whatever definition of malice may be laid down, the weakness of these broad generalizations, in my judgment, lies in the fact that they are practically useless. Scores of cases, I think, may be stated which would come fairly within these broad principles, but in which, nevertheless, a nonsuit would be granted. This view is indicated by Lord Herschell in the language above quoted.

There is the highest political, if not judicial, authority in this country for the proposition that all men have a right to "the pursuit of happiness," and that this right is so absolute that it is inalienable. But would anyone engaged in the practical administration of justice in a particular case define as a tort the intentional or "malicious" interference, without justification or excuse, with the plaintiff's right to the pursuit of happiness to the plaintiff's damage? Such a generalization embraces a large part of the law of torts. It seems to me that we have all the benefit of these very wide propositions in the one ancient maxim, *sic utere tuo ut alienum non laedas.*

8. Instead of formulating any novel rights or defining any novel torts, it might seem to some minds that the injunction ordered in this case is warranted upon the theory that the defendants are guilty of a tort which is in substance a private *nuisance* highly injurious to the complainant, and subject to interdiction by an injunction of a court of equity under well-settled rules. The common law protected the market. It punished forestalling, engrossing and regrating. A man has a natural right to buy goods that are offered for sale, and yet the common law made him a criminal if he bought up goods with the intent and with the effect to deprive his neighbors of the means of supplying themselves with similar goods excepting from him, and at a price therefor dictated by him. The violation of the right to a free market by unjustifiable coercion, which has the effect to prevent a party from satisfying his wants in the market, may perhaps be deemed a species of nuisance. It is, however, a mere matter of names and labels which we are now discussing.

9. I have purposely avoided the discussion of authorities in stating the various propositions above set forth because any such discussion would expand each proposition into a treatise. It is difficult, however, to avoid some examination of the cases of *Allen* v. *Flood* and *Quinn* v. *Leathem,* inasmuch as those two cases must be reckoned with in any strike or boycott decision at the present day. The conflict of opinion among the eminent judges who took part in the decision of these cases, and the inconsistency of some of the opinions rendered in support of the same side, warrant, I think, the utmost freedom of criticism whenever either of these cases is cited as an authority.

What I desire to point out in regard to *Allen* v. *Flood* is that, while we have a chain of coercion similar to the one with which we have dealt in this case, the coercion in fact originated in the voluntary combination of employes. According to the view of the facts which was adopted by the majority of the house of lords, the defendant, who was an officer of the labor organization of the employes, had no power to order a strike, and in fact merely undertook to *announce* what they (the employes) in free combination had voluntarily resolved to do. He did not announce that he, in the exercise of the enormous power of a labor organization, would compel, by coercion, the employes of the Glengall Iron Company to strike if that company did not discharge and refuse to further employ the plaintiffs. The case, therefore, when confined to its facts as ascertained by a majority of the court, without regard to what the eminent judges said in deciding it, presents, in my opinion, a clear instance of the exercise of the absolute right of employes to combine voluntarily and concurrently to refuse to continue in employment unless their employer will submit to their "dictation" in regard to the management of his business. It is true that the case does not decide that these employes possessed this absolute right about which no inquiry into motive or purpose can be tolerated. The case merely decided that the officer of the labor organization in announcing to the employer what the employes in combination had resolved to do, was guilty of no tort. Lord Watson, however, in his opinion—*A. C. 99 (1898)*—states that if the employes in combination had for themselves given the coercive notice to the

Glengall Iron Company under the influence of "bad motives towards the respondents, then, according to the law which has been generally accepted by the courts below, they would each and all of them have incurred responsibility to the respondents." It is perhaps not quite clear that Lord Watson disapproved of this law which he says had been "generally accepted by the courts below," but I do not think that any other of the majority judges in *Allen* v. *Flood* approved of such doctrine. Such doctrine, although sustained by much that is said in *Quinn* v. *Leathem,* is, of course, utterly inconsistent with the absolute right of employes in combination to refrain from contracting as hereinbefore set forth, and I think that any such doctrine is entirely inconsistent with the most if not all the authoritative American decisions.

It is certainly important to note that, in dealing with the alleged tort of the defendant in *Allen* v. *Flood,* no question of the effect of a combination "amounting to a conspiracy" had to be considered, inasmuch as the fact was established that the defendant acted alone.

In my opinion the question submitted by the trial judge to the jury in *Allen* v. *Flood,* whether the defendant "maliciously induced the Glengall Iron Company not to engage the plaintiffs or either of them," was, in a large degree, unintelligible, because of the use of the word "maliciously." *Flood* v. *Jackson, 2 Q. B. 24 (1895).* For all that appears in the reports of the case the jury may have taken the word "maliciously" in the popular sense, implying ill-will. The plaintiffs, however, in their declaration expressly charged that the defendants had wrongfully "intimidated and coerced" the plaintiffs' employer to discharge them and to refuse to make new contracts with them. *A. C. 11 (1898).* The plaintiffs, of course, had full opportunity to prove their case and presumably offered all the evidence which they had to establish that case. Even if the case was mistried and the real issue of fact was not presented to the jury for determination, what the house of lords appears to have done was to decide that a verdict should have been directed for the defendant. With such a ruling any error on the part of the trial court

in charging the jury, or any mistake of the jury in answering questions put to them, became immaterial.

It is, I think, a very curious circumstance connected with this case of *Allen* v. *Flood,* that the evidence left it doubtful whether the defendant notified the Glengall Iron Company that if the company did not discharge the plaintiffs "their men would· be called out," or merely that their men would "knock off." *A. C. 71 (1898).* If the defendant, as the representative of the labor organization, had the power to force these men to strike, which the majority of the court found not to be the case, or the Glengall Iron Company thought he had that power, then it seems to me that his liability in the action in respect of this part of the plaintiffs' claim might depend upon which of these two announcements he made to the plaintiffs' employer.

In the case of *Quinn* v. *Leathem* we have a chain of coercive action precisely the same as the one presented by the case at bar down to the last link. In *Quinn* v. *Leathem,* as in this case, the defendants were officers of a labor union, and this union controlled the employes of a butcher. The defendants wielded the entire power of the union. The employes of the butcher were bound to obey the defendants and strike whenever they gave the word. The butcher was a good customer of the plaintiff and every week took from him large quantities of meat. The defendants, in order to compel the plaintiff to discharge certain employes, coerced the butcher to refrain from dealing with the plaintiff, and they effected this coercion by announcing to the butcher that if he did not discontinue his dealings with the plaintiff they (the defendants) would "instruct" the butcher's employes to strike. *A. C. 517 (1901).* It clearly appears that the announcement or threat made by the defendants to coerce the butcher to refrain from dealing with the plaintiff was to the effect that the defendants would coerce the employes of the butcher to strike. *Quinn* v. *Leathem* therefore, when examined strictly with reference to its facts, and without regard to the opinions of the great judges who decided the case, is on all fours with the case now before this court, and will stand in the future, I think, as a precedent supporting the right to a free market. At the end of the chain in *Quinn* v. *Leathem* we find what con-

spicuously exists in this present case, viz., a coercive force upon the plaintiff's customer, exercised not by a voluntary combination of the customer's employes in the enjoyment of their absolute right to refrain from further employment without challenge as to their motives, but by a party who applies coercion to the employes so as to constrain them against their will to refrain from such further employment, such fundamental and final coercion not resulting from the exercise of any right such as the right to contract or refrain from contracting.

Of course, it cannot be claimed that the judgment of the house of lords, in *Quinn* v. *Leathem*, was rested upon the right which I have recognized as underlying the order in this case, and which I have called the right to a free market. On the contrary, the judges, with practical unanimity, placed their decision, in part at least, upon the ground that the party defendant happened to be not a single officer of the labor organization, as in *Allen* v. *Flood*, but five persons who were officers or agents acting for a labor organization. One question which the trial court put to the jury was whether the defendant "maliciously *conspired* to induce the plaintiff's customers or servants not to deal with the plaintiff." The judges substantially agreed that the element of "conspiracy" entered into the conduct of the defendants, and that the addition of this element opened the inquiry as to the defendants' motives and objects in their combined action. Lord Chancellor Halsbury emphasizes the fact that the defendants had acted "in pursuance of a conspiracy framed among them," and "with malice, in order to injure the plaintiff." *A. C. 506 (1901)*. He further points out (at *p. 506*) that "there was conspiracy, threats, and threats carried into execution, so that loss of business and interference with the plaintiff's legal rights are abundantly proved." If there was "interference with the plaintiff's legal rights," that fact would seem to put an end to all further discussion. There is always danger in using such phraseology as that quoted above from the lord chancellor that definite legal conceptions will be displaced by indefinite terms of abuse.

Lord McNaughton (at *p. 510*) expresses the opinion that the proposition is sound that "a conspiracy to injure resulting in

damage gives rise to civil liability." Lord Shand and Lord Brampton substantially subscribe to the same doctrine. Lord Brampton even said (at *p. 525*) that the cause of action was "not dependent upon coercion to break any particular contracts, though such causes of action are introduced into the claim, but the real and substantial cause of action is an *unlawful conspiracy* to molest the plaintiff, a trader, in his business, and by so doing to invade his undoubted right," viz., his right to regulate his business "according to his own discretion and choice." Of course, if a conspiracy is "unlawful," and causes damage, there can be little question about the liability of the conspirators. It seems equally clear that if what the defendant does invades the "undoubted right" of the plaintiffs, he is liable whether he acts alone or in association with others as a band of "conspirators."

Lord Lindley alone, so far as I have observed, points out (at *p. 534*) that the plaintiff's right to earn his own living in his own way involved the liberty of dealing "with other persons who were willing to deal with him," and that this "liberty or right to deal with others is nugatory unless they are at liberty to deal with him if they choose to do so." Lord Lindley then proceeds to use this most significant language: "Any interference with *their* liberty to deal with him affects *him*. If such interference is justifiable in point of law he has no redress." In these expressions I think the right to a free market is clearly indicated.

In dealing with the facts of the case (at *pp. 537, 538*) Lord Lindley points out that in *Allen* v. *Flood* the defendant "had no power to call out the men, and the men had determined to strike" before the defendant had anything to do with the affair, and continues as follows: "But if Lord Herschell meant to say that as a matter of law there is no difference between giving information that men will strike and making them strike, or threatening to make them strike by calling them out when they do not want to strike, I am unable to concur with him. It is all very well to talk about peaceable persuasions. It may be that in *Allen* v. *Flood* there was nothing more, but here there was very much more. What may begin as peaceable persuasions may

easily become, and in trades union disputes generally does become, *peremptory ordering,* with threats open or covert of very unpleasant consequences to those who are not persuaded. *Calling workmen out* involves very serious consequences to such of them as do not obey. * * * A threat to call men out, given by a trades union official to an employer of men belonging to the union and willing to work with him, is a form of coercion, intimidation, molestation or annoyance to them, and to him very difficult to resist, and, to say the least, requiring justification. None was offered in this case."

In my opinion this last-quoted statement of Lord Lindley expresses a doctrine which fully sustains the judgment in *Quinn* v. *Leathem,* and renders all discussion of "malicious conspiracy" and conspiracy with bad motives entirely unnecessary. If, as in *Allen* v. *Flood,* the defendant in *Quinn* v. *Leathem* had been a single officer of this powerful organization, and without conference or solicitation with anyone had threatened to order a strike which he had the power to order, it is not quite clear upon what ground a judgment against the defendant would have been sustained. There can be no doubt upon what grounds Lord Lindley would have sustained such a judgment. He positively rejects the argument which he says was made at the bar to the effect that if the defendant had been a single person his conduct would not have been actionable, and he concludes as follows: "One man exercising the same control over others, as these defendants do, could have acted as they did, and if he had done so, I conceive that he would have committed a wrong toward the plaintiff for which the plaintiff could have maintained an action."

The deliverances of these learned judges in *Quinn* v. *Leathem* in regard to the tort which consists in a "malicious conspiracy" to injure a man in his business, seem to indicate that if in *Allen* v. *Flood* the action has been brought against the employes of the Glengall Iron Company instead of against the single officer of their labor union who merely announced what they were "conspiring" to do, a judgment for damages against these employes would have been sustained. This result accords with the statement of Lord Watson quoted above from his opinion in *Allen*

v. *Flood* in regard to the law which had been "generally accepted by the courts below." It may be, however, that the English courts would draw the distinction between a voluntary combination of employes to use their power concurrently to refrain from further employment in order to secure the conduct of their employer's business in accordance with their ideas, and the action of two or more *outside* parties who for the same purpose intervene in an affair with which they have no direct interest and undertake by any means coercive or persuasive to cause those who are interested to use their combined power. If such a distinction should be taken while a possible conspiracy exists in either case, the motive actuating one combination might be deemed bad or "malicious" while the same motive actuating the other combination might not incur judicial condemnation. Such a distinction, however, in my opinion, leads to the recognition of a wider right than the right to a *free* market, and indicates that all dealers in the market are to be protected not only against unjustifiable coercion of persons who without such coercion would deal with them, but also against unjustifiable interference from outside parties by meddlesome persuasions and other non-coercive "inducements" causing disturbance to the *natural* market conditions upon which dealers make their calculations and invest their money.

10. I have discussed and criticised a number of legal theories in order to endeavor to show that the rejection of these theories does not involve any modification of the order for an injunction which was made in this case. That order, as I stated at the start, is directly sustained on the facts by the decision in *Templeton* v. *Russel, Quinn* v. *Leathem,* and a large number of American cases. If the doctrines announced in these cases, and especially in *Quinn* v. *Leathem,* are sustained, the order made in this case must necessarily be sustained; but if the doctrines announced by the judges in *Quinn* v. *Leathem,* and which I have criticised, are all rejected, the far narrower *ratio decidendi* of this case arising from the recognition of the right to a free market, which I have endeavored to expound, remains unaffected. My object, therefore, has not been to overthrow these legal theories which I have been criticising, but to show that

even if they are false the order of this court in this cause still may stand.

It is not necessary, for the purposes of this case, to admit or deny the soundness of the doctrine that a conspiracy, *i. e.,* a combination of two or more persons to cause damage, which in fact results in damage, gives rise, or may give rise, to civil liability, even though the same conduct pursued by one person would involve no liability whatever: What I want to try to establish is that a resort to the element of conspiracy in cases like *Quinn* v. *Leathem* and the one now before this court is entirely unnecessary, and by obscuring the subject under discussion interferes with the correct analysis of the plaintiff's right and of the defendant's tort.

The views which I have suggested in regard to the case of *Quinn* v. *Leathem* and the opinions of the judges delivered in deciding that case may be summed up as follows :

*First.* The right of the plaintiff which was vindicated was the right to a free market, and it was, as I have just stated, quite unnecessary to assert on the plaintiff's behalf the right to be protected against a conspiracy to damage his business, unless the conduct of the defendants complained of might have been pursued with impunity by a single defendant. The invasion of the plaintiff's right and the tort of the defendants consisted in the coercion exercised by them on the plaintiff's customer Munce by threat to coerce Munce's employes into a strike. This tort, as Lord Lindley shows, might be committed by a single defendant.

*Second.* If the employes of Munce had *voluntarily* combined to coerce him to refrain from dealing with the plaintiff by merely exercising their absolute right to refrain from contracting further with him (Munce) unless their demands were complied with, then those employes would have been guilty of no tort recognized by our American law, and no inquiry into their motives would be allowed.

*Third.* Whether a plaintiff who has been damaged in his business in a case like *Quinn* v. *Leathem* by coercion of his customers, effected by causing or threatening to cause the employes of such customers to strike by mere persuasions, payment of money, or any other non-coercive inducement, has a cause of action against

the person or persons who have so caused such damage is a question not raised in this present case. When such a case is presented it seems to me that the question of conspiracy, *i. e.*, the significance of a combination of two or more defendants, will come up only after it has been determined that the plaintiff had no right to natural market conditions as against unjustifiable interference by outside parties exercising the non-coercive inducement.

*Fourth.* If in these strike and boycott cases the element of a conspiracy is to be found, it would seem that there must be a combination among the defendants which brings to bear upon the plaintiff an aggregation of evil minds. This notion lay at the basis of the common-law crime of conspiracy. One man might resolve to cause, and undertake to cause, some damage to another without incurring criminal or civil liability, but if two or more men combined to do the same thing their conduct became oppressive. The increase of power from an aggregation of evil minds and wills constitutes the gist of the criminal offence of conspiracy.

Several of the English judges in these recent strike and boycott cases have intimated the opinion that for the same reason which sustained the criminal offence of conspiracy a combination of defendants in a case like *Quinn* v. *Leathem,* actuated by bad motives and causing damage to the plaintiff, constitutes a tort and creates civil liability, the combined action of two or more persons being an essential element of such tort. This reasoning may apply correctly to the voluntary combination of employes or employers, vendors or purchasers, acting together with intent to damage the plaintiff, and in fact causing such damage. In this case, however, notwithstanding the rule which, according to Lord Watson, had been "generally accepted" in the inferior English courts, and notwithstanding what Lord Chancellor Halsbury and other judges said in *Quinn* v. *Leathem,* I feel quite sure that the accepted American view sustains the absolute right of the combined body of employes or other dealers to refrain from contracting as they may see fit, however wicked or "malicious" their motives may be. But in all these cases of voluntary combinations of dealers we have presented one essen-

tial element of a conspiracy, viz., an enormous increase of power for evil arising from an aggregation or combination of evil minds.

But in cases like *Quinn* v. *Leathem,* as Lord Lindley has distinctly pointed out, the fact that the party defendant consists of two or more persons is a mere accident. It is true that in *Quinn* v. *Leathem* the power for evil resulted from a combination, but this combination was not that of the two or more defendants. The oppression and coercion resulting from the *combined action* of Munce's employes was the result of coercion upon them which required no combination in order to its exercise in the most complete degree. The employes of Munce, whose coerced combination was the menace which constrained him to refrain from dealing with the plaintiff, were not conspirators voluntarily and willfully uniting their several evil minds to oppress the plaintiff. On the contrary, they were victims. In the case before this court the employes of the boss carpenters are not conspirators willfully combining to do damage which each of them severally would be powerless to effect. It is, as I have undertaken to show, an essential element of the defendants' tort in this case that they coerce the employes of these carpenters to refrain from further contracting with their employers. The moment it appears that these unfortunate employes are willful conspirators the whole foundation of the plaintiff's claim that his right to a free market has been violated immediately disappears.

For the reasons indicated, it seems to me inadvisable to base the liability of the party defendant in cases like *Quinn* v. *Leathem* and the present case, when such party defendant happens to consist of more than one person, upon any theory of conspiracy.

In the foregoing discussion no distinction has been drawn between coercion of a single dealer or customer in the market and coercion of a large number of dealers or customers. As a matter of fact, in these boycott cases we have presented in every instance coercion of a number of dealers, or a class of dealers, and it is this sort of coercion of which the plaintiff complains. The tort in cases like *Quinn* v. *Leathem* and the present case consists essentially in the creation by coercion of an involuntary

combination, but the persons in combination are not conspirators, and are not made defendants in the suit. The party defendant, whether a single person, or two persons, or ten persons, should, I think, plainly be regarded as a unit.