### L. D. WILLCUTT AND SONS COMPANY *vs.* JEREMIAH J. DRISCOLL & others.

Suffolk.    March 19, 1907. — October 24, 1908.

Present: KNOWLTON, C. J., MORTON, HAMMOND. LORING, BRALEY, SHELDON, & RUGG, JJ.

*Equity Jurisdiction,* To enjoin unlawful interference with business.    *Unlawful Inter-ference.    Conspiracy.    Labor Union,* Coercion by threats of fines.

A building contractor can maintain a suit in equity to enjoin the members of a labor union, who are engaged in a lawful strike for higher wages and shorter hours of work, from causing those of his day laborers who are members of the union to leave his employ by threatening to impose fines upon them under a by-law of the union.    Following *Martell* v. *White,* 185 Mass. 255.    SHELDON, J. & KNOWLTON, C. J., dissenting, on the ground that the fining of the members of a union, under a by-law previously adopted, for refusing to join in a justifiable strike is lawful and properly may be resorted to in trying to maintain the strike.    Distinguishing the point actually decided in *Martell* v. *White.*    LORING, J., concurring in the decision of the majority of the court, on the ground that the ·present case cannot be distinguished from *Martell* v. *White* and that, although the doctrine of that case is not to be extended, the purposes of justice do not require that that case should be overruled as to the point that the use of threats of fines to exert coercion is illegal.

BILL IN EQUITY, filed in the Superior Court on July 19, 1906, and amended on November 22, 1906, by a corporation, engaged in the business of constructing buildings, against (as amended) certain individuals as officers and members of two voluntary unincorporated associations, the Bricklayers' Benevolent and Protective Union Number Three, and the Stonemasons' Be- ·nevolent and Protective Union Number Nine, both of Boston and the vicinity, and all other members of those unions, being upwards of eighteen hundred in number and most of them to the plaintiff unknown, the individuals named being the officers chosen by those unions for the management of their affairs and for doing the acts for and in behalf of the unions which were complained of in the bill, to enjoin the defendants from combining and conspiring by threats or intimidation to prevent any person or persons from entering the employ of the plaintiff or remaining therein, and particularly by the im-position of fines and penalties upon members of those unions

who desired to work for the plaintiff, from inducing or persuading in any way persons then, or thereafter, in the employ of the plaintiff from leaving such employment and breaking their contracts of employment, from imposing any fines or penalties or exercising any compulsion of any kind or using any threats or intimidation to prevent any person or persons, whether members of those unions or not, from entering into and continuing in the employ of the plaintiff, and for further relief.

In the Superior Court the case was heard by *Gaskill*, J., who made a memorandum of findings of fact, which so far as they are necessary to an understanding of the case appear in the opinion of the majority of the court.   The judge concluded his findings of fact with the following statement:

" The question resolves itself into this : In case of a justifiable strike, has the contractor the right to invoke the aid of the court to prevent the labor union from imposing a fine or taking action to impose one upon one or more of its members under its rules to induce them to leave the contractor's employ to his injury.   I think not.

" I am of opinion that Reagan was not justified in threatening the imposition of a fine.   Decree for plaintiff against Reagan, bill dismissed as to other defendants."   Reagan threatened a journeyman mason who previously had been a member of one of the unions with a fine of $100 if he continued to work.   The judge made a final decree enjoining the defendant Reagan, and dismissing the bill as to the other defendants.   The plaintiff appealed.

The case was argued at the bar in March, 1907, before *Knowlton*, C. J., *Morton, Loring, Sheldon,* & *Rugg,* JJ., and afterwards was submitted on briefs to all the justices.

*E. A. Whitman,* for the plaintiff.

*F. W. Mansfield,* for the defendants.

HAMMOND, J.   This bill, although originally brought against two unincorporated associations or labor unions by name, has now been amended, so that it runs only against certain individuals as officers and members of these associations and against the other members of those associations as represented by these individuals.   No question is made that the defendants do not sufficiently represent all the members of both unions ; and the

bill is not open to objection upon this ground. *Pickett* v. *Walsh*, 192 Mass. 572, 589, 590, and cases there cited.

The questions before us are raised upon a report of the facts found by the judge of the Superior Court who heard the case. They grew out of a trade dispute between the plaintiff and the members of the unions who were in its employ. In April, 1906, these unions adopted a code of working rules, in which, beside some minor demands not now material, they demanded that wages be increased five cents an hour, that all foremen should be members of the unions, that the business agent of the unions should be allowed to visit any building under construction to attend to his official duties, and that wages should be paid during working hours. The plaintiff declined to accept these rules, and a strike followed.

By the constitution and rules of the unions it appeared that a code of fines and penalties was established by the International Union, an association composed of these and other similar unions throughout the country, and that this code was being actively enforced by the local unions. One rule provided that any member violating any section of the working code should be fined upon conviction not less than five nor more than twenty-five dollars, one of these sections being that "No member of the Union shall work with a non-union man who refuses to join the Union." Various other penalties were provided, varying from five to five hundred dollars for each offense, to be imposed upon persons designated as "common scabs," "inveterate or notorious scabs," and "Union wreckers," these terms being applied to those who in different ways persist in working after a strike has been called. These fines in their operation are likely to be coercive in their nature.

This code was actively enforced by the unions, and most of the members of the unions who left their work did so through fear of the fines that would be imposed upon them if they continued to work. The defendants Driscoll and Reagan on one occasion found two men at work for the plaintiff, one a journeyman who had been and the other a foreman who then was a member of the union. Reagan threatened the journeyman with a fine of $100 if he continued to work, and Driscoll notified the foreman that he was called out. Both refused to leave. Driscoll reported

the fact at a meeting of the union and a vote was passed that charges be preferred against the men for working contrary to the rules. A preliminary injunction was issued in this case, and no further steps were taken under the vote.

The defendants established strike headquarters, and provided a strike fund from which payments were made to the strikers and other men out of work. Some of the defendants made constant visits to a job of the plaintiff, generally at noon time, to persuade men, whom the plaintiff had hired, to leave its employ. They offered as inducements in some cases to non-union men membership without the full payments usually required, and in other cases work elsewhere. Men frequently left the plaintiff's employ after these talks, in some cases stating that they would like to work but could not run the risk of being fined. The defendant Driscoll induced two men to go who otherwise would have continued at work, by paying them with funds of the unions the wages due them from the plaintiff and providing them with transportation to Utica, New York, where he had secured other work for them.

The plaintiff was constructing other buildings at Fairhaven and at Andover, which were within the districts of other unions ; and the union men employed by the plaintiff on those jobs also struck. It was found however that these men were not under the control of the defendants, though it did fairly appear that these strikes were a direct result of the strike in Boston, since all these unions were affiliated together in the International Union and all members of the unions were familiar with what should be done in such cases.

It was admitted that the defendants were not persons of financial responsibility, and the judge found " that the acts of the defendants as above set forth were calculated to interfere and did interfere with the performance of the plaintiff's contracts for the construction of buildings, and had they continued, would have seriously embarrassed the plaintiff in the prosecution of its business, and that such consequences were contemplated by the defendants in their endeavor to force the plaintiff to accept their working rules to govern the management of its business."

As already stated, the strike had four objects. Of these the demand for an increase of wages was properly enforceable by a

strike. The demand that wages should be paid during working hours amounts merely to a demand for a shorter day, and also was properly enforceable by a strike. The reasonableness of such demands we have not the means of determining; and it is settled that such matters are best left to be adjudicated in the freedom of private contract between the interested parties. More difficult questions are presented by the demands that all foremen shall be members of the unions, and that the business agent of the unions shall be allowed to visit any building under construction. See as to the first of these points a very interesting article by Professor Smith, 20 Harvard Law Review, 431, note 1. But it is unnecessary under the circumstances to determine these questions, as the plaintiff replied with a bare refusal of all the demands.

We are of opinion therefore that this strike must be regarded as simply a strike for higher wages and a shorter day. It was not a mere sympathetic strike, as in *Pickett* v. *Walsh*, 192 Mass. 572, 587, or one whose immediate object was only remotely connected with the ultimate object of the strikers, as in *Plant* v. *Woods*, 176 Mass. 492. It was a direct strike by the defendants against the other party to the dispute, instituted for the protection and furtherance of the interests of the defendants in matters in which both parties were directly interested and as to which each party had the right, within all lawful limits, to determine its own course. Such a strike must be treated as a justifiable strike so far as respects its ultimate object.

But however justifiable or even laudable may be the ultimate objects of a strike, unlawful means must not be employed in carrying it on; and it is contended by the plaintiff that the use of fines and threats of fines, under the circumstances disclosed in the record, are unlawful. The question is stated by the trial judge in the following language: " In case of a justifiable strike, has the contractor the right to invoke the aid of the court to prevent the labor union from imposing a fine [which the court has found to be coercive in its nature] or taking action to impose one upon one or more of its members under its rules to induce them to leave the contractor's employ to his injury?" Under the findings of the judge it would seem that the question is not intended to be quite so broad as otherwise might be inferred

from its language.  The language is broad enough to include
the case where the employee is under a contract to stay with
his employer and where to leave would be a violation of that
contract.  But no such state of things appears upon the record.
The plaintiff "hired its masons by the day and paid them on
the basis of the number of hours worked, and it might have dis-
charged them and they might have left at the close of any day."
The question must therefore be considered as applying only to
cases where the employee by leaving violates no contractual
right of the employer.

The question how far the imposition of fines by an organiza-
tion upon its members where the effect is to injure a third party
is justifiable, was considered by this court in *Martell* v. *White*,
185 Mass. 255; and it was there adjudged that the imposition
of such a fine by which members of the organization were coerced
into refusing to trade with the plaintiff, not a member, to his
great damage, was inconsistent with the ground upon which the
right to competition in trade is based, and as against him was
not justifiable.  In the course of the opinion the case of *Boutwell*
v. *Marr*, 71 Vt. 1, was cited, in which the same conclusion was
reached.  In *Martell* v. *White* five justices sat, and four of them,
being a majority of the whole court, concurred in the ground
upon which it was decided.  The case was carefully presented
by counsel, the questions involved were regarded as important,
and there was a difference of opinion among the judges who sat
in it.  It was therefore considered at great length; and the
conclusion was reached after a most exhaustive discussion and
the most careful deliberation.  It stands as a solemn adjudication
by this court after such discussion and deliberation.  So far as
respects the trend of judicial opinion and authority there has
been no change since the decision was announced unfavorable to
it or to the ground upon which it was reached.  On the contrary,
so far as we are aware, whenever the case has been mentioned
by members of the profession, whether they be judges engaged
in the practical administration of the law, or professors teaching
the students of our schools the true theory of legal principles, it
has been received with favorable comment.  See *Brennan* v.
*Hatters of North America*, 44 Vroom, 729; *Allis-Chalmers Co.*
v. *Iron Moulders' Union No. 125*, 150 Fed. Rep. 155, 178;

20 Harvard Law Review, 355, 356; 17 Green Bag, 210. There is every reason why the doctrine of *stare decisis* should apply; and, so far at least as respects this Commonwealth, the case must be held as settling the correctness of the principle upon which the decision was based.

That principle, if applicable to the facts of this case, is decisive. The majority of the court are of the opinion that it is applicable, and hence that there should be a decree for the plaintiff enjoining intimidation or coercion by fines.

Under ordinary circumstances this opinion would end here. But inasmuch as a minority of the court still think that the principle laid down in *Martell* v. *White*, with reference to intimidation by fines imposed by an organization upon its members, is not correct, and also, perhaps, that, even if correct, it is not applicable to the facts of this case, and are unwilling to accept that principle as law in this Commonwealth notwithstanding the authority of that case, it may be well to say something in addition to what was there said. We are also somewhat influenced to take this action by reason of the importance of the question and its relation to a part of the law still in the nebulous but clearing stage.

Before entering more fully upon the discussion it is well to get a clear conception of what the case is. To begin with, it is not a contest between the members of two competing labor unions, as was *Plant* v. *Woods*, 176 Mass. 492, nor is it a conflict between an organization and one of its members in a matter in which no third party is interested. Neither does the plaintiff corporation contend that it has any right to compel the intimidated workman to enter its employ. Nor is it seeking, in behalf of a member of a union, to enforce or defend the right of such member to be free from a fine or threat of a fine. The plaintiff has no concern with the imposition of fines by a union upon its members unless, and only so far as, such an imposition is in violation of a right of the plaintiff. Even if the fine be illegal the plaintiff has no standing in court to complain unless some one of its rights is invaded to its damage. In a word, the case is not between the party imposing the fine and the person fined, nor between the person fined as such and a third party who suffers, but on the contrary it is between such third party and

the party imposing the fine.   If it were only between the person fined and the party imposing the fine, then with some degree of plausibility it might be said that the former had no right to complain, or at least had waived that right; but it is manifest that neither of the immediate parties to the fine can, either by an agreement among themselves or by waiver, justify the invasion of the right of a third party, if any he has, to object to it.

What is the complaint of the plaintiff?   It is a corporation engaged in the construction of buildings and employing a number of men.   Its men left its employ on a strike.   To keep them away the defendants threatened with fines such as were members of the unions, and by that means kept them away from the plaintiff when otherwise they would have stayed; — all to the great damage of the plaintiff.   Shortly stated the case is this: The plaintiff's men are being coerced by threats of a fine to leave its employ, greatly to its injury, the fines to be levied in accordance with the by-laws of a voluntary association of which the proposed victims are members.   This injury to the plaintiff is intended by the defendants.   Has the plaintiff any standing in equity to an injunction against the infliction of such injury?

It is to be premised that the right which the plaintiff seeks to have protected against the acts of the defendants arises from no contract or statute, but out of the nature of things.   It is one of the large body of rights which have their foundation in the fitting necessities of civilized society.   It is the common law right to a reasonably free labor market.   Vice Chancellor Stevenson, in speaking of it, says it has been called a " probable expectancy," and describes it as " the right which every man has to earn his living or pursue his trade without undue interference."   *Jersey City Printing Co.* v. *Cassidy,* 18 Dick. 759, 765.   He further remarks (pp. 765, 766): " It will probably be found . . . that the natural expectancy of employers in relation to the labor market and the natural expectancy of merchants in respect to the merchandise market must be recognized to the same extent by courts of law and courts of equity and protected by substantially the same rules.   It is freedom in the market, freedom in the purchase and sale of all things, including both goods and labor, that our modern law is endeavoring to insure to every dealer on either side of the market."   And in *Atkins* v.

*Fletcher Co.* 20 Dick. 658, 664, the same judge says: " The elemental right of the employer of labor which the courts recognize to-day no doubt is the right to employ, while the corresponding right of the workman is the right to be employed. In other words, the right to buy labor and the right to sell labor are recognized by the law, and their enjoyment is greatly impaired or destroyed unless freedom in the labor market — freedom on both sides of the labor market — is maintained. Each party to a contract for the sale of labor has an interest in the freedom of the other party with respect to making the contract." In the words of Lord Lindley in *Quinn* v. *Leathem,* [1901] A. C. 495, 534, " A person's liberty or right to deal with others is nugatory unless they are at liberty to deal with him if they choose to do so." This right of the employer is conclusively established by the numerous cases which hold that he may maintain an action against those who by intimidation prevent persons from entering into his employ. See remarks of Lord Halsbury in *Allen* v. *Flood,* [1898] A. C. 1, 71, 72. In our own reports such a case may be found in *Vegelahn* v. *Guntner,* 167 Mass. 92. This is the right — the right to a free labor market — which the plaintiff asserts has been invaded by the defendants, and for which he seeks protection.

The defendants also have rights. They have the right to work or not to work, to sell their labor upon such terms as they see fit and to combine for the purpose of getting more pay or a shorter day. And for the purpose of strengthening their organization and making it more effective they have the right to make appropriate by-laws for its internal management, and for the regulation of the conduct of its members toward each other in matters affecting the general interests of the body ; and they may enforce obedience to such by-laws and regulations by fines or other suitable penalties.

But not much progress is made by this general statement of the rights of the respective parties. We are still only on the skirmish line. In the jurisprudence of any civilized country there are but few, if any, absolute rights, — rights which bend to nothing and to which everything else must bend. The right to one's life would seem to be quite absolute, but it must yield to the private right of self-defense and to the public right to punish

for crime. And so in the case before us, neither the right of the plaintiff to a free labor market nor the right of the union to impose a fine upon its members is absolute. Neither is to be considered apart from the other, or without reference to any other conflicting right, whether public or private ; but each must be regarded as having in the rules of human conduct its own place beyond the limits of which it must not go. Moreover it must be borne in mind (what sometimes seems to be forgotten by the actors upon each side of such controversies) that the controversy is not a warfare in the sense that for the time being the usual rules of conduct are changed, as in the case of an actual war between two countries. There is no martial law in these cases, no change in the ordinary rules of society, but these rules remain the same as before, commanding what was theretofore right and prohibiting what was theretofore wrong.

The right of an employer to free labor is subject to the right of the laborer to hamper him by many expedients short of fraud or intimidation amounting to injury to the person or property of those who desire to enter his employ, or threats of such injury. For instance, persuasion not amounting to such intimidation is lawful, and perhaps the same may be said of social pressure even when carried to the extent of social ostracism, not including however any threat in a business point of view. See *Vegelahn v. Guntner*, 167 Mass. 92 ; *Jersey City Printing Co.* v. *Cassidy*, 18 Dick. 759, 769 ; 20 Harvard Law Review, 267. Social rights and privileges must take care of themselves. The law cannot prescribe with whom one shall shake hands or associate as a friend.

So long also as the by-laws of a union relate to matters in which no one is interested except the association and its members, and violate no right of a third party or no rule of public policy, they are valid. Fines may be imposed, for instance for tardiness, absence, failure to pay dues, or for misconduct affecting the organization or any of its members; and for numerous other acts. It cannot be successfully contended, however, that as against the right of some party other than the association and its members an act, otherwise a violation of the third party's rights, is any less a violation because done by some member in obedience to a by-law. If a member commits an assault upon a

person, and is called into court by the Commonwealth upon a criminal complaint, or in a civil action by the victim, he can find no valid ground of defense in the fact that he committed the assault in compliance with the requirements of a contract with some other person, or in obedience to a by-law of an association of which he was a member. So a by-law providing that, upon an order to strike, every employee shall quit work even although such an act should be in violation of a contract then existing between him and his employer for continuous service, and that for failure thus to break his contract the member should be fined, doubtless would be declared invalid. And the principle at the bottom of such a decision is this, namely: An interference with the right of a third party cannot be justified upon the ground that the intruder is acting in accordance with an agreement between him and some other person. In a word, so long as a fine is imposed for the guidance of members in matters in which outside parties have no interest, or in which there is no violation of a right of an outside party, then no such party can complain. But when the right of such a party is invaded, it is no defense, either to the person fined or to those who have imposed the fine, that the invasive act was done in accordance with the by-laws of an association.

In the case before us, standing opposed to each other, are these two rights: the right of the employer to a free labor market, and the right of the striking employees in their strife with him to impair that freedom; and the crucial question is, how far can the latter go? On which side of the line shall stand the matter of coercion by fines imposed by a union upon its members to impair that freedom? Is the employer's right to a free market subject to this system of mutual intimidation and coercion by fines, or is the right to establish such a system subject to the right of the employer to a free market? If the employer's right is not subject to this method of intimidation, then of course as against him it is unlawful. If it is subject to it, then he cannot complain, no matter how severe the blow.

So far as concerns the law in this Commonwealth at least, some things seem to be settled. It is settled that the flow of labor to the employer cannot be obstructed by intimidation or coercion produced by means of injury to person or property, or

by threats of such injury.  *Vegelahn* v. *Guntner*, 167 Mass. 92.
In that case Allen, J., said: "Such an act [picketing as a means
of intimidation] is an unlawful interference with the rights both
of employer and of employed.  An employer has a right to en-
gage all persons who are willing to work for him at such prices as
may be mutually agreed upon ; and persons employed or seeking
employment have a corresponding right to enter into or remain
in the employment of any person or corporation willing to em-
ploy them.  These rights are secured by the Constitution itself.
*Commonwealth* v. *Perry*, 155 Mass. 117.  *People* v. *Gillson*, 109
N. Y. 389.  *Braceville Coal Co.* v. *People*, 147 Ill. 66, 71.
*Ritchie* v. *People*, 155 Ill. 98.  *Low* v. *Rees Printing Co.* 41
Neb. 127."  See also *Sherry* v. *Perkins*, 147 Mass. 212.  And it
is unnecessary to cite cases in support of the proposition that
such is the great weight of authority elsewhere, even though the
ultimate object of the strike be legal.

There can be no doubt that fining is one method of injuring a
man in his estate, and that a threat to fine is a threat of such an
injury.  Indeed this is recognized by the decree made by the
trial court in this very case, so far as it affects Reagan, one of
the defendants, who it was found had threatened with a fine a
man once but not then a member of a union.

It is urged however that although this method of intimida-
tion is generally an invasion of the employer's right to a free
market and therefore illegal, yet when the intimidation is exerted
by a union upon its members in accordance with its by-laws in a
strike whose object is legal, it is justifiable and legal.  To this the
obvious reply is that the rule of freedom to contract is founded
upon principles of public policy, that each party to a contract
is interested in the freedom of the other party, that it can make
no difference to the public or to the employer (who in the pres-
ent case is the other party), that the person intimidated is or
is not a member of the society intimidating.  In either case the
injury is the same and is from the same cause, namely, intimida-
tion.  The workman is no longer free.  In *Longshore Printing
Co.* v. *Howell*, 26 Ore. 527, the court, after speaking of the gen-
eral right of labor unions to make rules, proceeds thus: "It
must be understood, however, that these associations, like other
voluntary societies, must depend for their membership upon the

free and untrammelled choice of each individual member. No resort can be had to compulsory methods of any kind to increase or keep up or maintain such membership. Nor is it permissible for associations of this kind to enforce the observance of their laws, rules and regulations through violence, threats or intimidation, or to employ any methods that would induce intimidation or deprive persons of perfect freedom of action."

The keynote on this matter is struck in *Booth* v. *Burgess*, 65 Atl. Rep. 226, 233, in the following language: "No surrender of liberty or voluntary agreement to abide by by-laws on the part of the employees who are first coerced, made by them when they enter their labor unions, can . . . affect the right of the complainant to a free market, which right he will enjoy for all it may be worth if these employees are permitted to exercise their liberty. The employees may be able to surrender their own right, but they certainly cannot surrender the rights of other parties," citing *Boutwell* v. *Marr*, 71 Vt. 1, and *Berry* v. *Donovan*, 188 Mass. 353. And in *Downes* v. *Bennett*, 63 Kans. 653, 662, there is a recognition of the same doctrine: "This is not the case of a union or association of persons intimidating its members from engaging in a specific service offered by an employer, and standing ready and open to be entered. In such cases, on a showing of continuous damage caused by inability to secure employees, preventive relief has been afforded." *Boutwell* v. *Marr*, 71 Vt. 1.

An opposite doctrine leads to strange conclusions. For instance, if ten men banded together undertake by coercion to keep two other men from entering an employment, and they do this in order to force the employer, for lack of ability to get the two, to employ them (the ten), the employer's right to a free market is invaded, and if he suffers thereby he may proceed either in equity or law against the ten; but if the ten men first induce the two other men to enroll themselves in the same organization with the ten, then, it is said, the ten men may by fines or threats of fines so intimidate the two men as to frighten them from the employer; and that such intimidation is no violation of the employer's right. A rule of law which leads to such inconsistencies is not to be adopted. It does not distinguish between coercion and non-coercion, but between organized

coercion and sporadic coercion.   It makes a distinction entirely foreign and immaterial to the ground upon which the right to a free market is based.

If it be said that fines are not in themselves illegal, and that consequently their use cannot be illegal, the answer is that when they are used as a method of coercion and create a kind of coercion inconsistent with the right of a person they are, as against that person's right, illegal.   If it be said, as we have heard it said, that fines are innocent and cannot be illegal because they are used by all governments as a method of punishing criminals, the answer is that if the principle is true that, what a government may do to punish for crime, individuals or societies may do to enforce private rights, then it follows that a by-law providing for imprisonment or even death may be legal.

If it be said that the member fined may take his choice either to leave the organization or abide by its rules to which he has before assented, and that where there is a choice there can be no coercion, the answer is that in almost every conceivable case of coercion short of an actual overpowering of the physical forces of the victim there is a choice.   The highwayman, who presents his cocked pistol to the traveller and demands his purse under pain of instant death in case of refusal, offers his victim a choice. He may either give up his purse and live, or refuse and die.   In *Carew* v. *Rutherford*, 106 Mass. 1, the victim had a choice either to pay a fine or take the consequences of a refusal.   And so the member of a labor union has the choice either to pay the fine or leave the union.   Is it difficult to realize what that choice is in these days of organized labor?   Is it too much to say that many times it is very difficult, indeed practically impossible, for a workman to get bread for himself and his family by working at his trade unless he is a member of a union.   It is true he has a choice between paying his fine and not paying it, but is it not frequently a hard one?   May not the coercion upon him sometimes be most severe and effective?   Such is not a free choice. And a market filled with such men is not a reasonably free market.   In this connection the language of *Boutwell* v. *Marr*, 71 Vt. 1, seems significant and appropriate: "The law cannot be compelled by any initial agreement of an associate member to treat him as one having no choice but that of the majority, nor

as a willing participant in whatever action may be taken. The voluntary acceptance of by-laws providing for the imposition of coercive fines does not make them legal and collectible. . . . The fact that the relations and processes deemed essential to a recovery are brought within the membership and proceedings of an organized body cannot change the result. The law sees in the member of an association of this character both the authors of its coercive system and the victims of its unlawful pressure. If this were not so, men could deprive their fellows of established rights, and evade the duty of compensation simply by working through an association."

If it be said that without fines the same result may be indirectly reached by the organization by exercising two rights, namely, the right to expel a member and the right to charge an initiation fee upon his return, and since the same result may thus be legitimately reached, nobody is harmed if it be reached by fine, the reply is that if the purpose of expulsion and the subsequent initiation fee be each a part of one and the same transaction, namely, the imposition of a fine, and the two acts are in substance the procedure by which the intimidation by fine is exercised, and such is the intention, then there may be a strong reason for holding that such a procedure is one imposing a fine and should be treated as such. Ordinarily, however, each separate act should be treated by itself and its validity judged by itself. The fact that separately and independently executed they incidentally may have the effect of a fine is immaterial on the question of the right to fine. The fact that a result may be incidentally reached in one way does not show that the same result may be lawfully reached in another way.

In considering this question we cannot lose sight of the great power of organization. It should be taken into account when one is considering where the line should be drawn between the right of the employer to a free market and the right of workmen to interfere with that market by coercion through the rules of a labor union. It is not universally true that what one man may do any number of men by concerted action may do. In *Pickett* v. *Walsh*, 192 Mass. 572, Loring, J., after alluding to the great increase of power by combination, says: " The result of this greater power of coercion on the part of a combination of

individuals is that what is lawful for an individual is not the test of what is lawful for a combination of individuals; or to state it in another way, there are things which it is lawful for an individual to do which it is not lawful for a combination of individuals to do."

This organization of labor to better the condition of the laborer is natural and proper. There can be no doubt that it is the most effective way, perhaps the only effective way, in which as against the organization of capital the rights of the laborer can be adequately protected. In many ways the labor unions have succeeded in bettering the condition of the laborer; and so far as their ultimate intentions and the means used in accomplishing them are legal they are entitled to protection to the extreme limit of the law.

But their powers must not be so far extended as to encroach upon the rights of others. It is clear that if the power to intimidate by fine be regarded as one of the powers which labor unions may rightfully exercise, then the right to a free market for labor, — nay, even the right of the laborer to be free, — is seriously interfered with, to the injury both of the public and the employer as well as the laborer.

In *Martell* v. *White*, 185 Mass. 255, it was said: " The right of competition rests upon the doctrine that the interests of the great public are best subserved by permitting the general and natural laws of business to have their full and free operation, and that this end is best attained when the trader is allowed in his business to make free use of those laws." So of competition in labor; and so of competition between the employer and employee. The contest between them is only competition on a wide basis. As was said by Knowlton, C. J., in *Berry* v. *Donovan*, 188 Mass. 353, 358: " In a broad sense, perhaps the contending forces may be called competitors." If the contest be carried on under the rules which regulate the law of supply and demand, leaving those engaged on either side to act under the general and natural laws of business, free from artificial coercion or intimidation as the words are ordinarily understood in this connection, then neither party has the right to complain; but if coercion or intimidation by threats of a direct personal loss, due not to causes arising out of the situation or logical to the situa-

tion, but to a cause having no natural relation to the situation and entirely inconsistent with the basic principle of freedom of action under the natural laws of business, then there is cause for complaint. Such a method of coercion must be declared illegal, as in violation of the right of the public and all concerned to a reasonably free labor market, that is, a market where all may act under this basic principle of freedom.

In view of these considerations and of others more fully set forth in *Martell* v. *White,* which are not here repeated, and in *Boutwell* v. *Marr, ubi supra,* a majority of the court are of opinion that the overwhelming sense of the thing is that the principle that the right of the employer is not subject to coercion or intimidation by injury or threats of injury to the persons or property of laborers standing in the market to meet him, should apply to the coercion and intimidation exerted by labor unions upon their members by fines or threats of fines. Any other conclusion is inconsistent with the existence of a reasonably free labor market to which both the employer and the employee are entitled.

Our attention has not been called to any case, nor are we aware of any, in which the precise point here involved has been discussed, which is inconsistent with the conclusion which we have reached. We are not aware of any case in which it has been adjudged that where a third party has a right to insist that those with whom he deals shall be free from coercion the rule does not apply to coercive acts by way of fines or threats of fines, imposed or to be imposed, by a voluntary association upon its members in accordance with its by-laws. The case of *Bowen* v. *Matheson* was explained in *Plant* v. *Woods,* 176 Mass. 492. Neither in that case nor in *Pickett* v. *Walsh* was there any evidence of coercion by fines. And the same may be said of *Mogul Steamship Co.* v. *McGregor,* 15 Q. B. D. 476; 21 Q. B. D. 544; 23 Q. B. D. 598; [1892] A. C. 25. In that case there was simply a withdrawal of trade advantages under certain conditions. The defendants had two prices, — one price for one class of customers, and a different one for another class. There was nothing in the nature of an arbitrary fine. As stated by Fry, L. J., in the case as reported in 23 Q. B. D. 598, 622, " Competition was in substance the only weapon which the

defendants intended to use against their rivals in trade.   No thought of using violence, molestation, intimidation, fraud, or misrepresentation was entertained by the defendants." See also in same case the language of Coleridge, C. J., 21 Q. B. D. 544, 552; and that of Halsbury, Lord Chancellor, [1892] A. C. on p. 36, as follows : " After a most careful study of the evidence in this case, I have been unable to discover anything done by the members of the associated body of traders other than an offer of reduced freights to persons who would deal exclusively with them " ; and that of Lord Watson, on p. 43 of the same volume.

In the preparation of this opinion a large number of cases in addition to those hereinbefore named have been consulted, among which are the following : *Brown* v. *Stoerkel,* 74 Mich. 269 ; *Flaccus* v. *Smith,* 199 Penn. St. 128 ; *Fuerst* v. *Musical Mutual Protective Union,* 95 N. Y. Supp. 155 ; *Burns* v. *Bricklayers' Benevolent & Protective Union,* 14 N. Y. Supp. 361 ; *Master Stevedores' Association* v. *Walsh,* 2 Daly, C. P. 1 ; *Froelich* v. *Musicians Mutual Benefit Association,* 93 Mo. App. 383; *Doremus* v. *Hennessy,* 176 Ill. 608 ; *Bohn Manuf. Co.* v. *Hollis,* 54 Minn. 223 ; *Temperton* v. *Russell,* [1893] 1 Q. B. 715 ; *Wabash Railroad* v. *Hannahan,* 121 Fed. Rep. 563 ; *Mayer* v. *Journeymen Stonecutters' Association,* 2 Dick. 519 ; *Thomas* v. *Cincinnati, New Orleans & Texas Pacific Railway,* 62 Fed. Rep. 803 ; *Barr* v. *Essex Trades Council,* 8 Dick. 101.   See also for others, those cited in *Martell* v. *White,* 185 Mass. 255, and in *Pickett* v. *Walsh,* 192 Mass. 572.

The result is that in the opinion of a majority of the court there should be a decree restraining and enjoining the defendants, their agents and servants, from intimidating by the imposition of a fine, or by a threat of such fine, any person or persons from entering into the employ of the plaintiff or remaining therein ; or from in any way being a party or privy to the imposition of any fine or threat of such imposition upon any person desiring to enter into or remain in the employ of the plaintiff ; and it is

*So ordered.*


SHELDON, J.   The Chief Justice and I are unable to assent to the conclusion reached by the majority of the court.   We can-

not convince ourselves that under such circumstances as are here presented the defendants should be enjoined from imposing or threatening to impose fines upon those members of their organization who, by continuing to work for the plaintiff, had, under the rules to which they had themselves assented, become liable to such imposition. The question is one of great practical importance; it has been said that the law upon the subjects involved is not yet fully settled; and we think it proper to state the views which seem to us to be correct.

We assume that any defendants who have instituted or are carrying on an unjustifiable strike, or who for the prosecution and maintenance of a justifiable strike are inducing workmen either to leave or to refrain from entering the employ of a plaintiff, by the use of means which are either unlawful in themselves or would operate as an interference with a superior right of the plaintiff, — who, that is, have combined either to secure an unlawful end or to secure a lawful end by the use of unlawful means, — may be restrained by injunction, at any rate from such specific wrongful acts in furtherance even of a lawful strike as are unjustifiable towards the plaintiff and are likely to cause such injury to the plaintiff as to warrant equity in interfering. It would not be material in such a case that there was no continuing contract of employment between the plaintiff and the servants who were thus induced to leave him, or that the employer was complaining of the action of the labor union in seeking merely to enforce its rules upon its own members, although no question arose between the union itself and workmen who desired to continue in their employment but who were coerced by the fear of fines or of other consequences that might follow their infraction of the rules of the union. See as to this general doctrine *Martell* v. *White*, 185 Mass. 255; *Vegelahn* v. *Guntner*, 167 Mass. 92; *Perkins* v. *Pendleton*, 90 Maine, 166; *Boutwell* v. *Marr*, 71 Vt. 1; *Frank* v. *Herold*, 18 Dick. 443; *Booth* v. *Burgess*, 65 Atl. Rep. 226; *Spaulding* v. *Evenson*, 149 Fed. Rep. 913; *Temperton* v. *Russell*, [1893] 1 Q. B. 715. Nor is it doubted that the promoters of a strike would have no right to persuade a laborer to violate any existing contract of employment with the plaintiff. *Beekman* v. *Marsters*, 195 Mass. 205, 210, and cases cited. *Reynolds* v. *Davis*, 198 Mass. 294. Nor would they have

a right, by the threat of a fine or of any similar disciplinary measure, to prevent any one who was not a member of their union from working for the plaintiff. *Read* v. *Friendly Society*, [1902] 2 K. B. 88. *Haskins* v. *Royster*, 76 N. C. 601. *Angle* v. *Chicago, St. Paul, Minneapolis & Omaha Railway*, 151 U. S. 1. *Employing Printers' Club* v. *Doctor Blosser Co.* 122 Ga. 509. *South Wales Miners' Federation* v. *Glamorgan Coal Co.* [1905] A. C. 239. This is the fundamental doctrine of *Carew* v. *Rutherford*, 106 Mass. 1.

But the defendants' associations were lawful ones. The language of Knowlton, C. J., in *Reynolds* v. *Davis*, 198 Mass. 294, 302, states as to this point a universally recognized doctrine. No court would assert that the organization of a labor union constituted in itself an unlawful conspiracy. The objects aimed at by these unions were proper ones. Their main object, as stated in the constitution of one of them, the Bricklayers' Benevolent and Protective Union, is, "to unite all practical journeymen bricklayers working within the jurisdiction of this union, so that by concerted action their interests will be protected and their condition improved, and to render assistance to injured members, and also provide a proper burial for deceased members." The right of the defendants to form such combinations or unions for the purpose of protecting their interests and improving their condition by securing higher wages and shorter periods of labor, even in competition with other laborers, is undisputed. *Pickett* v. *Walsh*, 192 Mass. 572, 580. *Snow* v. *Wheeler*, 113 Mass. 179. *Carew* v. *Rutherford*, 106 Mass. 1, 10. *Commonwealth* v. *Hunt*, 4 Met. 111, 129.

Nor is there now any question that the defendants had the right through concerted action to attempt to secure the attainment of these lawful objects by means of a strike. If the end aimed at is lawful, the strike is lawful, and is not made unlawful by the fact that it is ordered and carried on by the action and through the instrumentality of a labor union. This is the express point of the decision in *Reynolds* v. *Davis*, 198 Mass. 294, a decision which was made only some months ago, and which as to this point was concurred in by every member of the court, the only dissent being as to the lawfulness of the purpose of the strike which was there considered. This means and must mean that

the members of a labor union who have engaged in a strike for a lawful purpose have a right to carry it on and to seek to make it effectual by the use of any means which are neither unlawful in themselves nor inconsistent with the exercise by others of any equal or superior rights.

It is conceded in this case that the defendants' strike was a lawful one, because it must be treated as instituted and carried on for the lawful purposes of obtaining higher wages and shorter periods of labor.   We adopt as to this question what is said in the majority opinion.   It follows accordingly that the defendants had a right not only to carry on their strike but to seek to make it successful by the use of whatever rightful means were available to them.   And this seems to us to be the general doctrine of the cases.   It has been upheld, either in terms or by necessary inference, in *Reynolds* v. *Everett*, 144 N. Y. 189 ; *Mills* v. *United States Printing Co.* 99 App. Div. (N. Y.) 605 ; *Rogers* v. *Evarts*, 17 N. Y. Supp. 264 ; *Downes* v. *Bennett*, 63 Kans. 653 ; *Longshore Printing Co* v. *Howell*, 26 Ore. 527 ; *Gray* v. *Building Trades Council*, 91 Minn. 171.   Indeed this proposition, as we understand, is not disputed by the majority ; nor has it been denied by any authoritative judicial decision.

The plaintiff in the case before us has indeed, like every other employer of labor, a right to enjoy a free labor market, to have a free flow of labor come to him, — that is, he has a right to employ such men as are willing to work for him upon such terms as may be mutually agreed upon between him and them: The strongest statements of this right may perhaps be found in some of the cases cited in the majority opinion.   *Brennan* v. *Hatters of North America*, 44 Vroom, 729.   *Jersey City Printing Co.* v. *Cassidy*, 18 Dick. 759, 765.   *Atkins* v. *Fletcher Co.* 20 Dick. 658, 664.   *Quinn* v. *Leathem*, [1901] A. C. 495, 534. But even these decisions follow the now universal current of authority in recognizing the right of the defendants to curtail and restrict this right of the plaintiff, by combining in labor unions to engage in a lawful strike for the improvement of their own conditions, and in endeavoring to render their strike successful by using all rightful means both to secure unanimity of action among their own members and to dissuade other laborers from entering the employ of the plaintiff.   That is, the

relative right of the plaintiff to enjoy a free labor market is modified and limited by the right of its employees to enter into an agreement or combination to secure higher wages or to improve otherwise the conditions of their employment, and for this purpose to engage in a strike and to use all rightful means to insure the success of their strike by checking, and if they can do so without resorting to wrongful means, by wholly stopping, the free flow of labor to the plaintiff.   But, if this be so, manifestly the plaintiff's right to a free labor market is not only not a paramount right, but it is and must be subject to the higher right of the defendants to combine and to carry on a strike by the use of whatever lawful means may be in their power; and we cannot see how this right can be further limited than by restricting it to acts which are not forbidden by law, either as being unlawful in themselves or at variance with a sound public policy.   Accordingly, the question now to be decided is whether we can say that the members of a labor union have no right, acting in conformity with rules previously established, to impose a fine upon one of their own members if he goes to work or continues to work for an employer against whom a justifiable strike has been declared in accordance with those rules, where there is no contractual right or duty on either side for the performance of such work.

If we are right in what thus far has been said, the answer to this question must depend upon whether the imposition of such a fine is either forbidden by some rule of law or is found to be inconsistent with some principle of public policy.   But in our opinion neither of these affirmations can be made.

The right of all voluntary associations, whether formed for the carrying on of business or for purely social purposes, to establish appropriate by-laws and regulations, not only for their own internal management but also to regulate the conduct of their members towards each other and in matters affecting the general interests of the body, is conceded.   And the right to enforce obedience to such by-laws and regulations by suitable penalties is generally recognized.   See, besides many other cases that might be cited, *Rex* v. *Westwood,* 7 Bing. 1, 90 ; 2 Dow & C. 21; *Goulding* v. *Standish,* 182 Mass. 401 ; *McFadden* v. *Murphy,* 149 Mass. 341 ; *Smith* v. *Nelson,* 18 Vt. 511 ; *Mayer*

v. *Journeymen Stonecutters' Association*, 2 Dick. 519; *Brown*
v. *Stoerkel*, 74 Mich. 269; *Wabash Railroad* v. *Hannahan*,
121 Fed. Rep. 563; *Martin* v. *Nashville Building Association*,
.2 Coldw. 418. That provisions for fines to be imposed for con-
duct injurious to the members of such voluntary associations
are not necessarily bad either as between the members them-
selves or as affecting the conduct of members towards third
persons was assumed in *Bowen* v. *Matheson*, 14 Allen, 499.
See p. 501. And although the manifest effect of the fine pro-
vided for in that case was to put at least a certain measure of
coercion upon the individual members of the association to per-
sist in conduct which had been found to be ruinous to the plain-
tiff's business, the decision was restated and approved in *Plant*
v. *Woods*, 176 Mass. 492, 500. The same may be said of other
cases cited in that opinion. The suggestions as to the deci-
sion in *Bowen* v. *Matheson*, made in *Martell* v. *White*, 185 Mass.
255, and in the majority opinion in the case at bar, really go no
farther than to say that such a fine is not necessarily unlawful;
but that is exactly what is here contended for.

We cannot make the law to be enforced against labor unions
in this respect more stringent than that which is applicable to
other organizations established for proper purposes. Such unions
are voluntary associations. They are formed for proper pur-
poses. Their objects are not only lawful, but commendable.
Like some other associations, the very purpose for which they
are created makes it highly important that their members
should be held together by the strongest possible bonds, so as
to work with absolute unanimity, especially in the time of a
trade dispute or strike. Pledges and promises binding all the
members are desirable. Voluntary agreements to abide in such
matters by the will of a majority of the members under a coer-
cive pecuniary influence, or even under pain of expulsion, can-
not be objectionable. Indeed, the right of labor unions to
enforce, under penalty of fine or expulsion, compliance by all
their members with rules and regulations which have been
adopted because deemed by a sufficient majority to be for the
common good and which are not in themselves inappropriate
or unlawful, is necessary to their continued existence. It is to
the united action of all their members that such organizations

owe their strength and their ability to accomplish the results at which they aim.   Doubtless persons who do not agree in the desirability of those results or in the wisdom or efficiency of the means adopted to secure them, cannot be required to continue as members against their will, any more than they could have been compelled to become members in the first instance. It is of the very essence of a voluntary organization that membership in it is and must continue to be itself voluntary; and this must be so on both sides as long as property rights do not come in question.   *Plant* v. *Woods*, 176 Mass. 492, 502.   *Flaccus* v. *Smith*, 199 Penn. St. 128.   *Longshore Printing Co.* v. *Howell*, 26 Ore. 527.   So long, however, as such membership continues and the organization still serves the purpose for which it was created, " the will of the individual must," as was said by the court in *Wabash Railroad* v. *Hannahan*, 121 Fed. Rep. 563, " consent to yield to the will of the majority, or no organization whether of society into government, capital into combination, or labor into coalition, can ever be effectual.   The individual must yield in order that the many may receive a greater benefit.   The right of labor to organize for lawful purposes and by organic agreement to subject the individual members to rules, regulations and conduct prescribed by the majority, is no longer an open question in the jurisprudence of this country."   So Taft, J., in *Thomas* v. *Cincinnati, New Orleans & Pacific Railway*, 62 Fed. Rep. 803, 817, after conceding the right of the employees of a receiver to organize themselves into a labor union which shall take joint action as to their terms of employment, and to elect officers to represent them, says: "The officers they appoint, . . . if they choose to repose such authority in any one, may order them, on pain of expulsion from their union, peaceably to leave the employ of their employer, because any of the terms of their employment are unsatisfactory." In *Mayer* v. *Journeymen Stonecutters' Association*, 2 Dick. 519, it appeared that members of the defendant association were practically compelled to acquiesce in the decision of the majority and to join in strikes or abstain from working for particular employers by forfeiture of membership consequent upon being declared "scabs"; and this was not interfered with by the court, no other coercion or actual violence having been used.

The same rule was applied in *Brown* v. *Stoerkel*, 74 Mich. 269, to persons suspended from a labor union for not joining in a strike. The validity of such rules as are here in question and of penalties to be imposed under them after due notice and hearing in conformity to the rules was either declared or recognized and assumed in *Pickett* v. *Walsh*, 192 Mass. 572, 575 ; *Fuerst* v. *Musical Mutual Protective Union*, 95 N. Y. Supp. 155; *Burns* v. *Bricklayers' Benevolent & Protective Union*, 14 N. Y. Supp. 361; *Master Stevedores' Association* v. *Walsh*, 2 Daly, C. P. 1; *Froelich* v. *Musicians Mutual Benefit Association*, 93 Mo. App. 383 ; and *Moores* v. *Bricklayers' Union*, 23 Weekly Law Bulletin (Ohio) 48. In *Quinn* v. *Leathem*, [1901] A. C. 495, the fines imposed were not treated as in themselves objectionable, but the decision was put upon the ground that the defendants had acted, not for any purpose of advancing their own interests as workingmen, but for the sole purpose of injuring the plaintiff in his trade. See language of Lord Stroud, p. 514. So in *Brennan* v. *United Hatters*, 44 Vroom, 729, it was assumed that the imposition of fines, even up to the amount of $500, might be lawful; but the case turned upon the fact that the plaintiff had not had such notice and trial as were guaranteed to him by the rules of the union. In *Booth* v. *Burgess*, 65 Atl. Rep. 226, the object of the fines was to enforce a strike which was merely sympathetic or in the nature of a boycott, such as was held to be unjustifiable in *Pickett* v. *Walsh*, 192 Mass. 572. In *Purvis* v. *United Brotherhood*, 214 Penn. St. 348, a strong decision against the coercion of an employer by sympathetic strikes against his customers, it was assumed throughout the opinion that the officers of the labor union would not have been prevented from enforcing by peaceful means upon their own members the rules of the union forbidding its members to work upon non-union material; and this would include the right to impose the penalties established by those rules. In *Mogul Steamship Co.* v. *McGregor*, 23 Q. B. D. 598, affirmed on appeal in [1892] A. C. 25, it appeared that conformity to the rules of the association was enforced by a penalty of dismissal, a severer and more drastic remedy than a mere pecuniary penalty, which practically could usually be enforced only by expulsion, and this fact was relied upon by the plaintiff upon the appeal (p. 30) ; but

both Lord Watson and Lord Morris declined to treat this threat of expulsion as involving any wrongful intimidation (pp. 43, 49, 50). Indeed, we do not understand it to be denied that those members of the unions who declined to join in the strike which was ordered were liable to expulsion by the unions acting in good faith ; and as it appears that the defendants are pecuniarily irresponsible, payment of the fines threatened could have been enforced only by expulsion. And the member of a union upon whom such a fine has been lawfully imposed in accordance with by-laws to which he has himself previously assented, is in no respect in the predicament of a highwayman's victim who has the bare option of parting with his money to save his life or of losing his life without thereby saving his money. The situation of one who finds himself compelled to choose between two alternatives, however distasteful, which he has brought upon himself and neither of which is unlawful, is in no way comparable to that of one who is compelled by wrongful force to elect between submitting to one of two alternative injuries, both of which are unlawful. An argument which rests upon such a comparison is without foundation.

Nor can we say that the imposition of fines, not in themselves unlawful and not injurious to the plaintiff except as they restrict an inferior right by the lawful exercise of a higher right, is to be regarded as contrary to a sound public policy. Gloomy vaticinations of injurious results to be apprehended from the excessive power which labor unions may acquire by their combination of many individuals into one body do not greatly impress us. The power of capital hitherto has not been found insufficient to prevent other than proper advantages from being gained by the representatives of labor, nor does it seem to us likely to be insufficient in the future. If it shall appear that there is such a danger, yet we cannot alter the law by denying to labor unions the rights and powers which the law gives to all lawful associations.

The law does not do so vain a thing as to allow the formation of labor unions and to declare their right to initiate and by lawful means to carry on a justifiable strike, and then refuse them the use of the only practical means by which their acknowledged rights can be secured. And see, beside the cases already cited, *Cote* v. *Murphy*, 159 Penn. St. 420, 430 ; *Bohn Manuf. Co.* v.

*Hollis*, 54 Minn. 223; *Macauley Brothers* v. *Tierney*, 19 R. I. 255. The books are full of cases recognizing the right of labor unions to enforce their rules upon their members in a reasonable way. There are but few cases that discuss by-laws authorizing the imposition of fines for a violation of rules; for their validity is almost universally conceded. It is believed that most of the many thousand labor unions in this country and Great Britain have such a rule or by-law, under which they are acting to-day without complaint from any one. In such action they are in our judgment simply adopting a principle which is of general application for similar purposes.

It is true of course that no man lawfully can be compelled at the mere dictation of other men to abstain from working for such prices and during such periods of labor as he may be willing to accept; but it is no less true that when one chooses voluntarily to unite with others of the same craft in forming an organization for the purpose of bringing about by the united action of all its members more favorable conditions of employment, he is bound, so long as he desires to remain a member of that organization, to submit within certain limits his own freedom alike of judgment and of action to the judgment of his associates, and to conform his conduct to that standard which they shall have agreed to be for the best interest of all and of each. Unity of action would be impossible upon any other terms. Accordingly, all the members of such a body have a right to expect, and by reasonable rules and appropriate penalties to provide for, the observance of such terms. Those who desire to employ the members of such organizations must expect this to be the case, and have no right to complain of the requirements of such rules, and of their reasonable enforcement upon each other by the members of such organizations. To this extent, the employer's relative right to a free labor market must yield to the higher right of the laborers to combine and to act in unison for the purpose of obtaining better terms from their employer. In other words, the general right of an employer to go into the market to hire laborers does not deprive a union, in carrying on a lawful strike, of the right to use upon its individual members, for the purpose of keeping them up to the performance of their duty as such members, all the influ-

ences that any other organization properly could use, including the imposition of fines.   The right to use such influences is an independent and paramount right.   The interests of the employer are subordinate to this right, and must yield to it.

Doubtless this power of discipline by fines or by the ultimate penalty of expulsion cannot properly be resorted to for the purpose of requiring conduct intrinsically unlawful, or for the purpose of compelling a minority member to join in action the ultimate object of which is to damage a third person. *Ertz* v. *Produce Exchange Co.* 82 Minn. 173.   Just as the rules of an association cannot protect its members who have done actionable injury to a third person, so a plaintiff who has suffered injury by the enforcement of its rules and penalties upon its own members for a wrongful purpose may properly be allowed a remedy.   *Carew* v. *Rutherford*, 106 Mass. 1, 10.   If a strike should be declared for an unlawful object, it would be illegal because of its object; and all the members trying to maintain it by direct or indirect action against the employer might be liable in damages and subject to injunction.   They would be so liable just as much without a by-law authorizing the imposition of fines as with one.   Any labor organization acting against an employer to prevent him from carrying on his business is acting, unlawfully if its action is without legal justification.   The case of *Boutwell* v. *Marr*, 71 Vt. 1, might well have been put upon this ground; and in our opinion our own case of *Martell* v. *White*, 185 Mass. 255, should have been rested upon a similar doctrine.   But if the object of a strike is legal and commendable, an effort to keep the members together by the imposition of fines, if need be, under a by-law previously adopted, is also legal and commendable.

The only cases that we have found which in principle are contrary to our conclusions are *Boutwell* v. *Marr*, 71 Vt. 1, the reasoning of which we regard as ill-considered and erroneous, and *Martell* v. *White*, 185 Mass. 255, in which a majority of this court followed the Vermont decision.   But in *Martell* v. *White* it was assumed (p. 262) that the fine was " so large as to amount to moral intimidation or coercion," and was " used as a means to enforce a right not absolute in its nature but conditional," and was " inconsistent with the conditions upon

which the right" rested.  None of these conditions are applicable here.  The findings made in this case went no further than that some coercion was exercised upon the striking members of the unions by their apprehension of fines.  We have seen that the fines which were threatened were not in themselves unlawful, were in accordance with the by-laws of the unions of which the strikers were members, and were imposed in conformity with a right which was paramount to any inconsistent right of the plaintiff.  We do not consider that the point actually decided in *Martell* v. *White* was necessarily inconsistent with the view here taken.  So far, however, as the general doctrine of that case is applicable to fines imposed for a violation of rules lawful in themselves and not sought to be enforced for a purpose either strictly unlawful or opposed to public policy or inconsistent with the general welfare of the community, we are not willing to follow it.  We do not think that the court can distinguish between the coercive effect of larger and smaller fines, or say as matter of law that they do, by reason merely of their magnitude, amount to moral intimidation.  All fines are necessarily coercive in their operation, if they have any effect whatever.  The statement that they may simply call the attention of a member of an organization to the fact of the infringement of some innocent regulation, or serve as an extra incentive to the performance of some absolute duty, we understand to be, and to have been manifestly intended to be, a concession that the degree of coercion which they exert in some instances may be a proper one.  Perhaps unreasonable or excessive fines sometimes might be found to amount to intimidation ; but we think it better to say that such fines as are here in question, not found to be excessive in amount, are not to be declared to be unreasonable or unlawful where they are imposed under rules or by-laws which are themselves proper and reasonable, are imposed for justifiable purposes, and are well adapted to serve useful ends for a paramount interest of the parties whose conduct they are to guide, and do not interfere with any absolute or superior right of a third person, or work an injury to his relative rights disproportionate to the good aimed at and reasonably expected to come by reason of them to the members of the association.  *Downs* v. *Bennett*, 63 Kans. 653.

To repeat what has already been said in substance, what seems to us the fallacy of the majority opinion is its failure to act upon the fact that the strike in this case was upon justifiable grounds, and of course was lawful. It follows that the action of each member of the union in trying to maintain the strike, without force, or wrongful coercion or intimidation exercised upon any one, was justifiable and lawful. It was not an interference with the rights of the plaintiff, because, as we have seen, the right of an employer to conduct his business without interference in the labor market is subordinate to the right of his employees to strike and to maintain the strike in a lawful manner. As against this right of the employees the employer has no right to have their labor flow to him uninfluenced or undiverted.

Accordingly, we are of opinion that the decree of the Superior Court should be affirmed.

LORING, J. For the reasons stated in the opinion of Mr. Justice Sheldon I should agree with the conclusion there reached were it not for the recent decision made by this court in *Martell* v. *White*, 185 Mass. 255.

The agreement in *Martell* v. *White* was not an agreement or combination of laborers to better their condition, but an agreement between certain manufacturers, quarriers and polishers of granite to buy and sell to and to work for each other to the exclusion of other granite manufacturers, quarriers and polishers. This court held such an agreement to be a valid one. Whether that agreement was a valid one is not now up for decision. For the purposes of this discussion I take *Martell* v. *White* to be a decision as to what means may be lawfully used to enforce a legal agreement.

In my opinion the decision in *Martell* v. *White* ought not to be overruled in the case at bar although it was wrong, provided laborers and labor unions will not suffer injustice from our standing by it.

The evils which ensue from overruling a wrong decision where no injustice is involved in following it are greater than those which come from standing by it. It would be hard to measure the disastrous consequences to the administration of justice if it

were thought that a change in the personnel of the court is to be the occasion for rearguing what has been decided.

The decision in *Martell* v. *White* will not (in my opinion) work injustice to employees and labor unions if it is confined to the point there decided and is not extended to broader propositions.

These broader propositions are as follows: (1) That employees have a right to combine to better their condition and to do all acts (not unlawful) necessary to make the combination an efficient one. (2) That they have a right to strike to gain that end if their demands therefor are not granted by their employer, and to do all acts (not unlawful) necessary to make the strike successful. And (3) that these rights of the employees are superior to the right of the employer to have a free flow of labor in his business.

There is nothing in the decision in *Martell* v. *White*, or in the decision in the case at bar, which calls in question these propositions or any one of them.

All that was decided in *Martell* v. *White* and all that is up for decision in the case at bar is that the imposition of a fine is the use of unlawful means.

It was not decided in *Martell* v. *White* that in case a member of a labor union (which has instituted a strike to get higher wages, for example) goes to work for the employer in question at the old rate, he cannot be expelled.

Neither was it decided in *Martell* v. *White* that since the labor union, in the case put above, can expel such a member, it cannot, if he goes to work for the old rate of pay, threaten to expel him for the purpose of keeping him in the ranks of the labor union, that is to say, in the ranks of the strikers.

Further, it was not decided in *Martell* v. *White* that if a member in the case put above is subject to expulsion because he has deserted the union and gone to work for the lower rate of pay, the union is not at liberty to impose upon him the payment of a sum of money for the common benefit as a condition of his reinstatement. In such a case the union is not bound to expel the deserter. It is at liberty to take him back. On the other hand, since it can expel him and at the same time is at liberty to take him back, it can take him back on such terms as it may choose to

impose, including the payment of a sum of money to the union for the common benefit.

And finally, since it may do this it may threaten to do this to keep such a fellow member from going back to work at the old lower rate of pay.   There is nothing in *Martell* v. *White* which denies or pretends to deny this right to a labor union.

A payment imposed upon a deserting member of a labor union under the circumstances stated above is not, using words accurately, a fine.   The difference is that a fine is imposed upon a former member for breaking the by-laws while he was a member, and can be collected whether the deserting member returns to the ranks of the union or not, while such a sum as is described above is a condition of the reinstatement of a member who has been expelled or is subject to expulsion, and cannot be collected if the member does not choose to be reinstated.

But although there is a difference between a fine and such a payment as is described above, the difference between the two is of no practical consequence to labor unions.   So long as a labor union can impose upon a member who is subject to expulsion the payment of a sum of money as a condition of his reinstatement, the right to impose a fine (giving to that word its accurate meaning) is of no practical consequence.   No labor union in the past ever attempted to collect a fine from a member who had left the union and did not seek reinstatement.   And no labor union will ever find it worth while to enter on such litigation. The game is not worth the candle.   It is because the difference between these two things is not of practical consequence that I think that *Martell* v. *White* should not be overruled.   What we are dealing with in the case at bar are the practical rules which govern strikes properly instituted for a proper purpose.   If a wrong decision has been made, it had better stand if it does not work injustice.   As I have said, if the decision in *Martell* v. *White* is not extended it does not work injustice, and for that reason (in my opinion) it ought not to be overruled in the case at bar.

I am of opinion that the case at bar is covered by the decision in *Martell* v. *White.*   Further that the decision in *Martell* v. *White* ought not to be overruled in this case, and that the plaintiff is entitled to the decree stated in the opinion of a majority of the court.